Metropolitan Edison Company, Appellant, *v.*
Public Service Commission et al.

12

Argued October 9, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, JAMES and RHODES, JJ.

*David I. McCahill,* with him *Harold J. Ryan* and *Charles H. English,* for appellant.

*John C. Kelley* and *Richard J. Beamish,* with them *Harry H. Frank* and *Samuel Graff Miller,* for appellee.

*Harry A. Honker* and *George F. Baer Appel,* with them *Townsend, Elliott & Munson,* for intervening appellee.

OPINION BY RHODES, J., April 26, 1937:

The Borough of Myerstown filed an application with the Public Service Commission for a certificate of public convenience "evidencing its approval of the acquisition, construction and beginning of the exercise of the right to operate a municipal electric light and power generating plant and for acquiring or erecting a distributing system for such light and power, both for supplying light and power for municipal purposes and to the public generally."

The Metropolitan Edison Company, which has been exclusively supplying electricity to the Borough of Myerstown and the inhabitants thereof for many years, protested.

After numerous hearings, with a resulting record of 2300 pages, the commission found that "the erection of the proposed municipal light and power generating plant and distribution system, for supplying light and power for municipal purposes and to the public generally by the Borough of Myerstown, is necessary and proper for the service, accommodation, convenience and safety of the public"; and it approved the application, and granted a certificate of public convenience.

From this order of the Public Service Commission the Metropolitan Edison Company has appealed.

The complaint of the appellant is that the order of the commission is not based upon findings of fact supported by competent and relevant evidence.

Prior to the incorporation of the town or village of Myerstown into a borough, on February 5, 1912, the territory now within the borough limits was a part of Jackson Township. On January 6, 1906, the Myerstown Electric Company was incorporated for the purpose of supplying light, heat, and power by electricity to the public in the Township of Jackson, Lebanon County. On March 20, 1907, the Myerstown Electric Company sold and conveyed its franchises and all its property to the

14

Edison Electric Illuminating Company of Lebanon. On July 22, 1912, the Myerstown Electric Light Company was incorporated for the purpose of supplying light, heat, and power by means of electricity to the public in the Borough of Myerstown, Pa. On December 16, 1912, a number of electric light and power companies, including the Myerstown Electric Light Company, were merged and consolidated into a new body corporate by the name, style and title of Lebanon Valley Electric Light Company. On May 8, 1913, the Borough of Myerstown approved an ordinance granting permission to the Lebanon Valley Electric Light Company, its successors and assigns, upon certain conditions and restrictions to erect, construct, maintain, and operate its poles, conduits, wires, fixtures, and other necessary appliances, upon, across, over, along, under, and through the streets, alleys, and highways of the borough. Section 12 of the ordinance provided: "The said Council reserves to itself the right at any time to erect, maintain and operate a municipal plant for the manufacture, distribution and supply of electricity to the public of said Borough for lighting, heating, power or other purposes, and nothing in this Ordinance contained shall be construed to deprive or curtail the said Borough from the exercise of the authority and right aforesaid, or from the authority and right to maintain and operate a municipal plant for the manufacture, distribution and supply of gas to the public of said Borough, for lighting, heating, power or other purposes, or from the authority and right to maintain and operate a municipal plant for the manufacture, distribution and supply of light, heat and power to the public of said Borough by any other means." The terms and conditions of this ordinance were accepted in writing by the Lebanon Valley Electric Light Company. On August 6, 1917, the Metropolitan Electric Company, the Edison Electric Illuminating Company of Lebanon, Pa., and Lebanon Valley

Electric Light Company entered into an agreement of consolidation and merger under the name of Metropolitan Edison Company, which agreement was approved by the Public Service Commission August 15, 1917, and a certificate of public convenience issued to Metropolitan Edison Company; letters patent were issued to the new corporation August 30, 1917.

Appellant has no formal franchise evidenced by an ordinance enacted by the Borough of Myerstown other than that approved on May 8, 1913, granting permission to the Lebanon Valley Electric Light Company, its successor and assigns.

The electors of the Borough of Myerstown, on May 15, 1934, authorized an increase of indebtedness of the borough "by the amount of One Hundred and Twenty-five Thousand Dollars ($125,000.00) to provide funds for and toward purchasing land and erecting thereon a municipal electric light and power generating plant and for acquiring or erecting a distributing system for such light and power, both for supplying light and power for municipal purposes and to the public generally."

The estimated cost of this generating plant and distribution system, as fixed by the engineer of the applicant, is $119,838, exclusive of engineering fees, preliminary expenses, and certain other items.

The estimated gross annual revenue of the municipal plant and system is $48,869.22, which is assumed to be the gross annual revenue received by appellant from the borough and its customers therein.

Applicant's proposed distribution system is to be a duplicate of the system of the appellant in the Borough of Myerstown. The proposed municipal plant is to consist of 3 Diesel engines having 148, 223, and 300 horsepower, respectively, and 3 A. C. generators having capacities of 100, 150, and 200 K. W., respectively.

The duty and scope of inquiry of this court on appeals of such cases as this have been so frequently and exhaus-

tively stated that it is unnecessary to restate them in detail in this opinion. We refer to sections 22 and 23, article 6, of the Public Service Company Law, as amended by Act of June 12, 1931, P. L. 530 (66 PS §§ 836, 837), and section 24, article 6 (66 PS § 838). Suffice it to say that this court is without authority to set aside a finding of fact by the Public Service Commission which is supported by substantial evidence where no constitutional question is involved, except as provided by Act of June 12, 1931, P. L. 530, §1 (66 PS §836). See *City of Scranton v. P. S. C.,* 80 Pa. Superior Ct. 549, 563. Where the finding of the commission is based upon competent and relevant evidence it will not be disturbed by this court; the responsibility for such findings is upon the commission; and it is not within our province to consider the expediency or the wisdom of the commission's order. See *Motor Freight Express and Hall's Motor Transit Co., Inc., v. P. S. C.,* 117 Pa. Superior Ct. 174, 177 A. 493; *Incorporators of Service Gas Co. v. P. S. C.,* 126 Pa. Superior Ct. 381, 190 A. 653; *Cage et al. v. P. S. C.,* 125 Pa. Superior Ct. 330, 189 A. 896; *Borough of Lewistown v. P. S. C.,* 80 Pa. Superior Ct. 528; *Collins et al. v. P. S. C.,* 84 Pa. Superior Ct. 58.

The applicant, the intervening appellee, in the first instance, had the burden of establishing that the approval of its application for a certificate of public convenience was necessary or proper for the service, accommodation, convenience, or safety of the public. This is true notwithstanding the ordinance approved May 8, 1913. "This State has held that no contract, private or municipal, can be made beyond the reach of regulation because of article XVI of the Constitution relating to nonabridgment of the police power": *Springfield Consolidated Water Co. v. Philadelphia,* 285 Pa. 172, at page 175, 131 A. 716, at page 717. The right of the intervening appellee to construct its own electric plant as

between it and the appellant is not questioned; this right would exist in the absence of any ordinance containing such a reservation. But a condition precedent to the exercise of such right is the obtaining of a certificate of public convenience from the Public Service Commission. It follows that the question for that tribunal was whether the proposed municipal plant of the intervening appellee is "necessary or proper for the service, accommodation, convenience, or safety of the public." See *City of Scranton v. P. S. C. et al.,* 268 Pa. 192, 110 A. 775. The appellant and its predecessors in title had been, since 1912, lawfully supplying electricity to the Borough of Myerstown and to the inhabitants thereof; and it was not precluded from becoming a protestant.

The intervening appellee sets forth, inter alia, in its application to the commission for a certificate of public convenience:

"8. The proposed acquisition, construction and operation is necessary and proper for the service, accommodation and convenience of the public for the following reasons: . . . . . .

"(c) The electric service to the people of the Borough may be furnished at substantially lower rates than the people of the Borough are now paying.

"(d) The Borough and the people of the Borough and of the Community will receive better and more efficient service than they are now receiving."

No evidence was introduced before the commission to sustain either of these averments; the commission has made no such direct findings; and the evidence affords no basis for such inferential conclusions.

At the first hearing before the sitting commissioner the applicant, the intervening appellee, presented Raymond Weiant, as a witness, who was a resident of the Borough of Myerstown and who had been engaged for twenty years as foreman of a stone quarry in that bor-

ough. He was asked: "Q. That stone quarry was being operated in the Borough of Myerstown? A. Yes, sir. Q. Did they ever use electric current from the Metropolitan Edison Company in the operation of the quarry? A. Yes, sir. Q. Will you state what interruptions you had in the service on account of lack of electric current? Mr. McCahill: Just a minute. We will ask for an offer and the relevancy of this testimony. The Commissioner: What do you propose to prove by this witness? Mr. Honker: Mr. Commissioner, we propose to prove by this witness, as well as by a number of other witnesses, what we allege in our petition: That these communities would have better service than they are now receiving from the present service. Mr. McCahill: We, of course contend that is immaterial. There is no allegation here that the service is inadequate. The Commissioner: Has any complaint been filed by the Borough or by the citizens of the Borough of Myerstown with the Commission for failure to render adequate service? Mr. Honker: Not that I know of, but I think the question of efficiency is here a question. The Commissioner: For alleged inadequate service there is a proper procedure before the Commission for that, is there not? Mr. Honker: Mr. Commissioner, I can well see that this is one way, but it does seem to me that it becomes a question that should be considered in a matter of this character. (Discussion off the record.) The Commissioner: I rule that any testimony as to unsatisfactory service rendered on any occasion by this company in the past is irrevelant and immaterial in this hearing. (Exception noted for applicant by directtion of the sitting Commissioner.)"

We are of the opinion that the proposed testimony should have been admitted, and that the ruling of the sitting commissioner was erroneous. Before proceeding to give our reasons for this conclusion, we quote from the report of the commission as follows:

"The Commission policy of regulated monopoly as opposed to unrestrained competition and applied to public service companies, is founded upon sound principles tested by experience, but no administrative policy, however valid, can be allowed to harden into a restriction which would disregard the circumstances of a given case. If the administrative policy operates to limit administrative discretion, the body enunciating the policy has bound itself by its own chains, and the policy formulated to accomplish public welfare and advantage may operate to defeat those ends.

"In 1916 this Commission in its opinion in the Application of the Borough of Catasauqua, 3 Pa. P. S. C. 1024, first enunciated the policy of non-competition by a municipal corporation with an existing public service company. In that case the Commission refused to permit the borough to construct and operate a municipal electric light system where it appeared that a private corporation was then rendering service within the borough. However, it is to be noted that the Commission said: 'We do not intend by this to establish an unalterable policy. There may be instances where a utility company has been so indifferent to and so neglectful of its public obligation that this Commission would be justified in admitting competition, thus selecting the lesser of two evils.' "

At the argument of this case, counsel for the Public Service Commission stated that the commission had changed its established policy of noncompetition. The reasons for the heretofore noncompetitive policy in this state and the objectives to be attained by the enactment of the Public Service Company Law have been frequently stated by the commission itself and by our appellate courts. See *Relief Electric Light, Heat and Power Company's Petition,* 63 Pa. Superior Ct. 1; *Jenkins Township v. P. S. C.,* 65 Pa. Superior Ct. 122; *Hoffman et al. v. P. S. C.,* 99 Pa. Superior Ct. 417;

*Perry County Telephone & Telegraph Co. v. P. S. C.,*
265 Pa. 274, 108 A. 659.

The policy of this state, relating to the regulation of
public service companies, as set forth by legislative en-
actments and judicial interpretations thereof, has been
that of regulated monopoly as opposed to unrestrained
competition. Public utilities, if they rendered adequate
service to the public at reasonable rates, could expect to
be protected from unfair and ruinous competition. The
commission is the instrumentality created by the legis-
lature to act as its agent in seeing to it that the public
is furnished with adequate service at reasonable rates;
it is an administrative agency of the legislature. As a
necessary corollary, the commission is authorized to
determine, in the exercise of its administrative func-
tions, when and to what extent an existing utility
actually engaged in rendering a public service shall be
protected from competition, either from a similar util-
ity or through the rendition of the same service by a
municipality.

The legislature may determine in a statute what the
public policy of the state shall be, or it may designate to
such an agency as the commission the power and duty
to determine what it shall be; but in either event the
policy thus determined may become a matter for the
courts if it seems to contravene constitutional limita-
tions. The declared public policy is always subject to
the scrutiny of the courts. "It must not be understood,
however, the act takes from the courts all jurisdiction
over public service companies. On the contrary, all acts
of this body are subject to judicial scrutiny, but through
the channel ordained by the legislature and as set forth
in article VI of the Public Service Act": *Fogelsville &
Trexlertown Electric Co. v. Pennsylvania Power &
Light Co.,* 271 Pa. 237, at page 241, 114 A. 822, at page
824.

The legislative declaration here involved is contained

in section 3 (d) of Article III of the Public Service Company Law (66 PS § 182), which provides: "Upon like approval of the commission first had and obtained, as aforesaid, and upon compliance with existing laws, and not otherwise, it shall be lawful— ......

"(d) For any municipal corporation to acquire, construct, or begin to operate, any plant, equipment or other facilities for the rendering or furnishing to the public of any service of the kind or character already being rendered or furnished by any public service company within the municipality."

This is subject to the further requirement found in section 18, article 5, of the Public Service Company Law (66 PS § 681), that, "when application shall be made to the commission by any municipal corporation for the approval required by the provisions of article three, section three (d), of this act,—such approval, in each and every such case, or kind of application, shall be given only if and when the said commission shall find or determine that the granting or approval of such application is necessary or proper for the service, accommodation, convenience, or safety of the public."

When it is proposed to authorize a municipality to construct its own electric plant and distribution system for the purpose of competing with an existing electric company, which for a number of years has been furnishing service in the municipality, it would seem that some of the pertinent inquiries, which should be made by the commission in order that the exercise of its discretion may be based upon reasonable grounds, would be: (a) Whether there are any fundamental defects in the service being rendered by the existing utility, due to inadequacy of plant, or distribution system or lack of financial strength.[1] (b) Whether the existing utility has been indifferent to, or neglectful of, its public ob-

---

[1] *Schuylkill Light, Heat and Power Company's Petition*, 1 Pa. Corp. Reporter 122.

ligations.[2] (c) Whether the existing utility has failed in any way in its obligation to furnish adequate service at reasonable rates.

For this reason the proposed testimony of the applicant relative to interruptions of service should have been admitted. It also appears that the applicant offered to prove by a number of witnesses that the communities would have better service than they are now receiving from the existing utility. If this could be shown, such a situation would be quite persuasive.

If the commission had followed in this case its long established policy of protecting existing utilities from ruinous competition, the ruling of the sitting commissioner on the offers of proof of the applicant might be sustained; but when, as here, the commission has reversed its policy, it has made such inquiries as we have mentioned most material.

The commission relies upon the proposition that its order in this case is within its "administrative discretion." It declares that, "in the exercise of that discretion in the field of electric power, a policy of regulated competition by municipalities has been adopted." "Necessarily, the exercise of its administrative discretion is not without some limitation. It may not be capricious, arbitrary, or unreasonable; and an order of the commission must be founded on competent and relevant evidence, and otherwise be in conformity with law": *Cage et al. v. P. S. C.,* supra, 125 Pa. Superior Ct. 330, at page 332, 189 A. 896, at page 897. In *Incorporators of Service Gas Company v. P. S. C.,* supra, 126 Pa. Superior Ct. 381, at pages 385, 386, 190 A. 653, at page 655, this court again said: "The commission does not, however, have unlimited discretion; its acts are subject to judicial review, and its findings and final order must have a substantial basis in the testimony."

---

[2] *Application of the Borough of Catasauqua,* 7 Pa. Corp. Reporter 297, 3 Pa. P. S. C. 1024.

The commission may not arbitrarily or capriciously authorize competition in one municipality and deny it in another similarly situated. So far as the present proceeding is concerned, the same findings and order could be made upon the application of any municipality when the commission thinks the municipality could earn a fair return by putting the existing company out of business.

The commission's change of policy from one of regulated monopoly to one which it calls regulated competition by municipalities would not in itself require a reversal of an order of the commission; but the commission cannot under the guise of regulation act arbitrarily, nor can it capriciously exercise the functions lodged in it. See *Relief Electric Light, Heat and Power Company's Petition*, supra, 63 Pa. Superior Ct. 1, pp. 14, 15.

We are not unmindful of the difficulty which would confront intervening appellee in attempting to submit adequate evidence that the rates charged locally by appellant for electric service are unreasonable. We also believe that intervening appellee should not be obliged to engage in protracted litigation to compel a reduction of appellant's rates if they are unfair and unreasonable. It is obvious that the set-up of appellant's financial structure is such as to make that course virtually prohibitive. But if it could be shown that a municipal plant could be built, capable of generating and supplying electricity to the borough and the residents thereof, as now furnished by appellant, for such a sum and operated for such costs as to permit rates, producing a fair return on the investment, less than those charged by appellant, it would tend to demonstrate that appellant's local rates are unfair and unreasonable for the service rendered. Appellant should be able to furnish current at lower rates than a local plant. The only justification for merger and consolidation of small plants into a large system is the ability of

the large corporation to furnish better and more adequate service at lower rates. If the result of such merger and consolidation is to charge the public higher rates than those at which a local plant could furnish like service, then there is no reason or excuse for the continuance of its exclusive franchise, and competition, municipal or otherwise, may properly be permitted. The commission has made no finding as to the cost of such a municipal plant, or the probable operating expenses. It has made no finding that the proposed plant is capable of producing the estimated gross revenues; but the record does disclose that the plant as initially designed, with only three generating units, could not meet the maximum demand admitted by the borough's engineer. An assumption that the proposed plant would yield a fair return on the investment is unwarranted in the absence of proper findings supported by evidence.

The order of the commission is reversed, and the record is remitted for such further action as the commission may deem proper, not inconsistent with this opinion.

KELLER, P. J., agrees that the evidence as to the inadequacy of the appellant's service should have been admitted, but he is of opinion that there is sufficient evidence in the record to sustain a finding that the order of the commission was not arbitrary or unreasonable, and therefore he would affirm it.