Seaboard Tank Lines, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

602

Argued May 8, 1985, before President Judge Crum-lish, Jr., and Judges Rogers, Craig, MacPhail, Doyle, Barry and Palladino.

*Peter G. Loftus,* for appellant.

*Alan Kohler,* Assistant Counsel, with him, *Alfred N. Lowenstein,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*A. Taylor Williams,* with him, *Alan Kahn, Abrahams & Lowenstein,* for intervenor, Machise Interstate Transportation.

*J. Bruce Walter, Rhoads & Sinon,* for Amicus Curiae, Nelson's Express, Inc. and Hess Trucking Co.

OPINION BY JUDGE BARRY, December 23, 1985:

This appeal results from an order of the Pennsylvania Public Utility Commission (PUC) which affirmed the decision of an administrative law judge (ALJ) granting the application of Machise Interstate Transportation (Machise) for an amendment to its certificate of public convenience.

Machise is a New Jersey trucking corporation engaged in the transport of petroleum products, operating in Pennsylvania and holding a certificate from the PUC since 1980. In March, 1983, Machise filed an application to amend its certificate in order to expand its authority to transport petroleum products. Seaboard Tank Lines (Seaboard) shortly thereafter entered a protest against the application, stating that it possessed a certificate encompassing the applicant's requested area of operation, and alleging, among other things, that the proposed service would be competitive with and detrimental to Seaboard's preexisting service, and that the existing service was adequate.

Hearings were held before an ALJ, at which Machise presented testimony from several shippers attesting to their desire to deal with Machise in the involved territory, and to their satisfactory experiences with Machise in the past. Seaboard presented testimony regarding its operations in the area of the proposed amendment, with which it sought to establish that Seaboard and the other authorized carriers had satisfied the requirements of local shippers. Seaboard also presented testimony to the effect that it had approximately ten per cent of its fleet available to handle any excess needs.

The ALJ premised his decision on the PUC's transportation regulatory policy statement,[1] promul-

---

[1] The evidentiary criteria of the policy is codified at 52 Pa. Code §41.14, which reads in its entirety as follows:

gated by the PUC in 1982. The ALJ found that convincing testimony had been submitted to enable Machise to have met its burden of proof of demonstrating that the proposed service was responsive to public demand or need. Likewise, Machise was found to possess the logistical and fiscal capabilities required under the policy for authority to provide the expanded service. Finally, the ALJ found no danger of disservice to the public interest in permitting the Machise amendment, finding specifically that Seaboard, the only protestant,[2] was not in a position of being unduly harmed by the grant of the application. Having found that the requirements under the new policy had been met, the ALJ approved the application and ordered that an amendment be made to Machise's certificate.

Seaboard appealed from the ALJ's ruling. The PUC, however, adopted explicitly the ALJ's decision

§41.14.  Evidentiary criteria used to decide motor common carrier applications.

(a)  An applicant seeking common carrier authority has a burden of demonstrating that approval of the application will serve a useful public purpose, responsive to a public demand or need.

(b)  An applicant seeking motor common carrier authority has the burden of demonstrating that it possesses the technical and financial ability to provide the proposed service, and, in addition, authority may be withheld if the record demonstrates that the applicant lacks a propensity to operate safely and legally.

(c)  The Commission will grant motor common carrier authority commensurate with the demonstrated public need unless it is established that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers to such an extent that, on balance, the granting of authority would be contrary to the public interest.

[2] Coastal Tank Lines, Inc. initially filed a protest, but withdrew upon a minor amendment of the application by Machise.

as its own, and issued an order allowing the amendment. Seaboard then appealed to this Court.

We are mindful that our review in the present appeal is limited to a determination of whether the PUC's decision to affirm the order of the ALJ granting the Machise amendment was in error, as a matter of law, or because unsupported by substantial evidence. *Sharon Steel Corp. v. Pennsylvania Public Utility Commission,* 78 Pa. Commonwealth Ct. 447, 468 A.2d 860 (1983). In undertaking our review, we note that protestant Seaboard has, from the inception of this litigation, asserted that the legal standard applied is erroneous and, indeed, unlawful, and that findings made under that standard are unsubstantiated; both issues have been properly preserved for appeal.

For many years, the PUC consistently required that, before a certificate of public convenience would be granted, an applicant bore a burden of "establish-[ing] the need for the service or the additional service and the inadequacy of the existing service." *Motor Freight Express v. Pennsylvania Public Utility Commission,* 188 Pa. Superior Ct. 80, 85, 146 A.2d 323, 325 (1958). *See also Samuel J. Lansberry v. Pennsylvania Public Utility Commission,* 66 Pa. Commonwealth Ct. 381, 386-87, 444 A.2d 832, 834 (1982). In cases where it was found that the standard had been arbitrarily or capriciously applied, the court would reverse or modify the PUC's order. *See Kulp v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 379, 383, 33 A.2d 724, 725-26 (1943) ("the error in the order consists in assuming, without proof, that existing facilities are inadequate throughout the entire territory of the order."); *Application of L. P. Transportation, Inc.,* 25 Pa. Commonwealth Ct. 412, 415, 359 A.2d 848, 849-50 (1976) (record failed to support conclusion that existing service inadequate; PUC reversed).

In 1983, however, the PUC promulgated and published in the Pennsylvania Bulletin a modified policy under which to decide motor common carrier applications. The new policy essentially preserves the criteria traditionally employed, but eliminates the applicant's evidentiary burden of demonstrating the inadequacy of existing service. Instead, an existing carrier may successfully protest the granting of new authority if "it is established [by the protestant] that the entry of a new carrier into the field would endanger or impair the operations of existing carriers to such an extent that, on balance, the granting of authority would be contrary to the public interest."[3] It was this criterion that the ALJ applied in the case before us. Seaboard has asserted that the new policy is unconstitutional and unlawful, arguing that the replaced requirement of demonstrating inadequate service was in fact *legislatively* mandated,[4] and beyond the discretion of the PUC to modify. Although the issue is a difficult one, we disagree.

The PUC's mandate with respect to the granting of certificates of public convenience is a broad one: "a certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa. C. S. §1103(a). The legislature, however, provided no definition of specifically what the criteria were to be in determining the propriety of granting a

---

[3] 52 Pa. Code §41.14(c).

[4] In its *Amicus* Brief, Nelson's Express, Inc. and Hess Trucking Company have advanced a slightly different argument. In their brief, it is acknowledged that a certain degree of regulated competition was envisioned by the legislature, but it is alleged, nevertheless, that before competition may be allowed by the PUC, a *threshold* determination of inadequate existing service need be reached as a matter of legislative mandate.

certificate, leaving the formulation of such criteria to the PUC.[5] It is true, as discussed above, that courts have consistently articulated the "inadequacy" requirement as an element of a utility's application for authority. Nevertheless, it is evident that the policy of the legislature pursuant to which the original criteria were established does not show an intention that expanded service be allowed only when existing service is inadequate. Rather, we believe that that policy consists of the more broad intention that utilities not be allowed to engage in unrestrained and destructive competition, which activity was thought to be, by its very nature, at odds with the public interest. Significantly, we find in addition that at the inception of utility regulation it was the Public Service Commission (PSC), the forerunner of the PUC, which formulated the criteria of which the inadequacy requirement is a part.

In an early PSC decision, *Harmony Electric Co.*, 1 Pa. S.C. 75 (1914), the commission noted that a utility "rendering *adequate* and satisfactory service" was entitled to regulatory protection whenever "threatened with consequences that may endanger the future existence of the company." *Id.* at 80 (emphasis added). This language, which constitutes the pivotal reasoning in the case, follows clear indication

---

[5] *See Yellow Cab Co. v. Pennsylvania Public Utility Commission*, 161 Pa. Superior Ct. 41, 54 A.2d 301 (1947):

We have frequently stated that the extent to which there shall be competition in the intrastate transportation of freight and merchandise by common carrier is largely a matter of policy which the legislature committed to the . . . Public Utility Commission, and that the question is, for the most part, an administrative one which must be left to the sound judgment and discretion of the commission . . . .

*Id.* at 51, 54 A.2d at 306 (quoting *John Benkart & Sons Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 13, 16, 7 A.2d 588, 589 (1939)).

from the commission that the pervasive concern of the legislature, and of the commission in fashioning standards or criteria under which to grant certificates, was the right of the public to be free from the results of destructive over-competition:[6]

> It is a matter of common observation that where the policy of promoting competitive traffic between corporations engaged in public service business is too freely encouraged . . . the practice is followed as a rule by consequences that are disastrous to all the interested parties. The community that consumes the commodity, the utility that furnishes the service . . . must all be properly safeguarded in their rights and interests when a public service company is invited to enter a municipality to do business under competitive conditions.

*Id.* Significantly, the commission itself indicated at an early point that the "inadequacy" inquiry was a creation of its own: "[F]ollowing the action of similar commissions of our sister states and believing in the economic wisdom of regulation and control of existing companies, we have adopted as an *administrative policy* the denial of entrance of new companies to fields adequately and properly served." *Application of Wilkes-Barre Light Co.*, 2 Pa. S.C. 913, 915 (1917) (emphasis added).[7]

---

[6] *See also Harmony Electric Co. v. Pennsylvania Public Service Commission*, 78 Pa. Superior Ct. 271, 282 (1922) ("the present policy of the Commonwealth [is] to avoid destructive competition between . . . public utility corporations. This is now the policy of the Commonwealth as declared by the Public Service Commission . . . .").

[7] This notion has clearly received an appellate blessing: "The question, what number of motor vehicles as common carriers for hire is necessary or desirable for the convenience, comfort and safety of the public, is not a legal but administrative one, which the law requires to be determined by the Public Service Commission." *Hoffman v. Public Service Commission*, 99 Pa. Superior Ct.

Appellate courts were likewise of the opinion that the "inadequacy" requirement was not legislatively mandated. In *Pottsville Union Traction Co. v. Public Service Commission*, 67 Pa. Superior Ct. 301 (1917), the court dealt with an application for a certificate of public convenience sought by a bus operator, which application had been protested by an electric railway company which contended that its service in the area was "adequate and afford[ing] sufficient transportation facilities." *Id.* at 302. The court, however, rejected the notion that the mere fact that "adequate" service existed would preclude a grant of further authority: "We cannot hold the Public Service Commission to the rigid rule that if there be one carrier supplying service between certain points, and that service is ordinarily adequate, that it is obliged invariably to refuse a certificate to other applicants including those using other methods of carriage." *Id.* at 303. In so stating the court was not permitting the commission to arbitrarily abandon its own settled criteria concerning the grant of certificate. Instead, the court made it clear that the commission possessed the discretion to make a broad determination of what was in the public interest:

In some cases no doubt a refusal to allow auto-bus competition is proper depending upon existing conditions. Some leeway must be allowed to the commission for the exercise of the discretion which the legislature has put in its hands. . . . The primary object of the public service laws is not to establish a monopoly or to guarantee

---

417, 423 (1930) (emphasis added) (citing *Collins v. Public Service Commission*, 84 Pa. Superior Ct. 58, 61 (1924)). *See also Modern Transfer Co. v. Pennsylvania Public Utility Commission*, 139 Pa. Superior Ct. 197, 202, 12 A.2d 458, 461 (1940); *John Benkart & Sons Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 13, 17, 7 A.2d 588, 589-90 (1939).

the security of investment in public service corporations but first and at all times in the just exercise of its powers to serve the interests of the public.

*Id.* at 304.[8]

Additionally, we find the decision in *Metropolitan Edison Co. v. Public Service Commission*, 127 Pa. Superior Ct. 11, 191 A. 678 (1937), to be of pivotal significance in assessing prior opinion of the nature of the "inadequacy" requirement. In *Metropolitan Edison*, a protestant had appealed the granting of a certificate on the grounds that the commission had not made findings based upon such evidence as would entitle the applicant to a certificate of authority. The commission had "changed its established policy of noncompetition" in the field of electric power generation to one of "regulated monopoly," and granted a certificate notwithstanding the fact that inadequacy on the part of the existing service had not been raised or demonstrated. The court reversed, however, unconvinced that the commission had arrived at findings under its *new* policy which were supported by the evidence, concluding as follows:

> The commission's *change of policy* from one of regulated monopoly to one which it calls regulated competition by municipalities *would not in itself require a reversal of an order of the commission*; but the commission cannot under the guise of regulation act arbitrarily, nor can it capriciously exercise the functions lodged in it.

191 A. at 680, 127 Pa. Superior Ct. at 23 (emphasis added).

---

[8] *See also Harmony Electric Co. v. Pennsylvania Public Service Commission*, 78 Pa. Superior Ct. 271, 282 (1922), ("even now the noncompetitive policy is not absolute or a binding rule of law, for it is within the power of the Public Service Commission, in its judgment, to permit a competing company to be established . . . .").

We believe that these cases are proof that neither the PSC nor the courts believed that the requirement to show "inadequacy" of service was legislatively mandated. Instead, the requirement was formulated, and recognized as arising in a *regulatory* context, as the commission sought to vindicate its mandate to protect the public interest by preventing unrestrained and destructive competition.[9] At this juncture we note that the new criterion is totally suitable for continuing pursuit of this mandate: Section (c) provides existing carriers the opportunity to protest the granting of new authority upon a demonstration that a new entry would endanger operations of existing carriers to an extent "contrary to the public interest." Indeed, in the present controversy, the ALJ, in applying the criteria, appeared fully prepared to deny the application if it appeared that Seaboard or any other protestant would have been harmed to any extent detrimental to the public interest. To the extent that adequacy of service was an end to be achieved by the passage of utility laws, we believe that this latter criterion is suitable to continue seeking such an end.[10]

[9] We believe that these early cases, decided near the inception of utility regulation, demonstrate that, as an historical fact, the "inadequacy" requirement was not legislatively mandated. We note, however, that this court has likewise endorsed this notion. *See Mobilfone of Northeastern Pennsylvania, Inc. v. Pennsylvania Public Utility Commission*, 73 Pa. Commonwealth Ct. 340, 345, 458 A.2d 1030, 1034 (1983) ("The requirement of proving inadequacy of existing service is *not statutory*, but one means . . . to be used in deciding whether statutory standards will be met.") (Emphasis added) (quoting opinion of ALJ).

[10] We thus disagree with Seaboard in its argument that, when the legislature recodified the Public Utility Law as the "Public Utility Code" in 1978, it effectively codified the "inadequacy standard" into section 1103(a). As the establishment of the inadequacy requirement was an act of administrative discretion, reenactment of the section pursuant to which it was established constitutes no more than an intent to continue to allow to the PUC discretion

Accordingly, the PUC acted within its discretion in its formulation of its new evidentiary criterion.[11]

to grant certificates within the statutory language of section 1103(a).

[11] The similar experience of the Interstate Commerce Commission in its modification of common carrier entry standards is persuasive in our resolution of this case. The commission is charged with granting certificates of public convenience when necessary to satisfy the "public convenience and necessity," or when "in the public interest." 49 U.S.C. §10922. As was the case in Pennsylvania, the legislature failed to define these concepts with specificity, leading the ICC to formulate entry criteria not unlike that developed by the PSC, including, relevantly, the requirement of a demonstration of inadequacy of existing service. See *Inland Motor Freight v. United States*, 60 F. Supp. 520 (E.D. Wash. 1945). In the early 1970's, however, the ICC began to liberalize its entry criteria, and it increasingly began to weigh the benefits of competition against the detriment to existing carriers. This general exercise of administrative discretion was upheld by the United States Supreme Court. See *Bowman Transportation Co. v. Arkansas-Best Freight System*, 419 U.S. 281, 293-294 (1974). The portion of the new standard applied by the ICC similar to part (c) of the PUC's new evidentiary criteria, required the protestant "to convince the ICC that the newcomer is likely to materially jeopardize the existing carriers' ability to serve the public." See generally Thoms, *Motor Carrier Regulation 1935-1980*, 13 Transportation L.J. 43, 74 (1984). See also *Liberty Trucking Co., Extension-General Commodities*, 130 M.C.C. 243 (1978). This particular portion of the ICC's new evidentiary policy was upheld as within the discretionary power of the ICC. See *Assure Competitive Transportation, Inc. v. United States*, 635 F.2d 1301 (7th Cir. 1980).

We note in addition the ICC's view of the relation between the "inadequacy requirement" and legislative intent:

It should be kept firmly in mind that the term "inadequacy of existing service" is not interchangeable with the statutory standard of "public convenience and necessity," for it has long been established that the inadequacy of a protestant's service is only one element to be considered in arriving at the broader determination of public convenience and necessity. Indeed, in many instances such as this the existence of a satisfactory existing service is not the most important element in our ultimate determination of public need.

*Ace Freight Line, Inc., Extension-Canned Goods*, 124 M.C.C. 799, 802

Seaboard has also asserted that Machise has failed to demonstrate a public need for its proposed service,[12] and hence that the ALJ's finding to this effect is not supported by substantial evidence. This argument is put forward, of course, under the presumption that the entire new evidentiary criteria is illicit, a notion which we have rejected. Nevertheless, reviewing all of the ALJ's findings under the new criteria, including that which requires the new service to be "responsive to a public demand or need," we find them adequately supported by the evidence. *Sharon Steel*, at 449, 468 A.2d at 861.

We will, therefore, affirm the decision of the PUC and dismiss the appeal of Seaboard.

## ORDER

Now, December 23, 1985, the order of the Pennsylvania Public Utility Commission, is hereby affirmed.

---

(1976). For a discussion of the inadequacy requirement under the Interstate Commerce Act, and the ICC's interpretation thereof, see Dempsey, *Entry Control Under The Interstate Commerce Act: A Comparative Analysis of the Statutory Criteria Governing Entry in Transportation*, 13 Wake Forest L. Rev. 729, 731-44 (1977).

[12] Not surprisingly, Seaboard also alleges that Machise has failed to prove inadequacy of existing service. As we find that the PUC's promulgation of the new evidentiary criterion was a proper exercise of its discretion, we need not address this issue in the context in which advanced by Seaboard.