868 A.2d 384

CHESTER WATER AUTHORITY, Appellee

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant,

Philadelphia Suburban Water Company, Intervenor.

Chester Water Authority,

v.

Pennsylvania Public Utility Commission, Philadelphia
Suburban Water Company, Intervenor.

Appeal of Philadelphia Suburban Water Company, Intervenor.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2004.

Decided Feb. 23, 2005.

Stanley Eugene Brown, Bohdan R. Pankiw, Frank B. Wilmarth, Harrisburg, for Public Utility Commission.

Richard Dylan Procida, Arthur Levy, Media, for Chester Water Authority.

Carl Robert Shultz, Harrisburg, Michael D. Klein, Blue Bell, for National Association of Water Companies, Pennsylvania Chapter.

William T. Hawke, Harrisburg, for Philadelphia Suburban Water Company.

Before: Cappy, C.J., Castille, Nigro, Newman, Saylor, Eakin, Baer, JJ.

## *OPINION*

Justice SAYLOR.

This appeal concerns a municipal water authority's challenge to Public Utility Commission approval of an extension of service by an investor-owned water company to a new real estate development that the authority wishes to serve.

Appellant, Philadelphia Suburban Water Company ("Philadelphia Suburban"), presently known as Aqua Pennsylvania, Inc., is an investor-owned water company that is incorporated in Pennsylvania and regulated by the Pennsylvania Public Utility Commission (the "Commission" or the "PUC"), pursuant to the Public Utility Code.[1] Appellee, Chester Water Authority is a municipal authority organized under the predecessor to the current Municipality Authorities Act.[2]

In August of 2001, Philadelphia Suburban filed a verified and duly-noticed application for a certificate of public convenience under Section 1102(a)(1) of the Public Utility Code, 66 Pa.C.S. § 1102(a)(1), which requires a public utility to obtain the Commission's prior approval (as evidenced by a certificate of public convenience) before offering or rendering new service. The company's objective was to expand its service territory to supply water to a new residential, real estate

1. Act of July 1, 1978, P.L. 598, No. 116 (as amended 66 Pa.C.S. §§ 101–3316).

2. Act of June 19, 2001, P.L. 287, No. 22 (as amended 53 Pa.C.S. §§ 5601–5622).

development in Thornbury Township, Delaware County, known as Cherry Farm, which is proximate to existing Philadelphia Suburban facilities abutting the entrance road of the planned development. In support of its application, Philadelphia Suburban described the need for the water service relative to the new construction; referenced its financial, technical, and legal fitness, *inter alia,* in terms of the substantial scale of its existing, regulated operations;[3] averred that the Cherry Farm developer requested water service from Philadelphia Suburban in writing, supported by a copy of a letter attached to the application; and indicated that the company would provide service to the residents of the Cherry Farm tract at the same Commission-approved rates that apply to other customers located in the company's West Chester division. The application thus facially tracked Section 1103 of the Public Utility Code, which requires an applicant for a certificate of public convenience to establish that that the proposed service is "necessary or proper for the service, accommodation, convenience or safety of the public," 66 Pa.C.S. § 1103, and the PUC's interpretation of this statute, which, as a general rule, has required that an applicant demonstrate a public need or demand for the proposed service, the inadequacy of existing service or facilities in the proposed territory, and the applicant's fitness to render such service, along technical, financial and legal lines. *See, e.g., Seaboard Tank Lines, Inc. v. Pennsylvania PUC,* 93 Pa.Cmwlth. 601, 605, 502 A.2d 762, 764 (1985).[4]

3. Philadelphia Suburban's application notes that the company has been engaged in the water supply business for over 100 years; its service territory covers approximately 500 square miles located generally in southeastern Pennsylvania, including portions of Chester, Berks, Bucks, Delaware, and Montgomery Counties; within those counties, the company services customers in approximately 100 townships and boroughs, reflected in its approximately 320,000 customer accounts; and the company's average daily water output is over 113 million gallons per day.

4. There are several variations in the Commission's interpretation of Section 1103, arising out of the fact that certain categories of jurisdictional utilities compete within their service territories. *See, e.g., Elite Industries, Inc. v. Pennsylvania PUC,* 574 Pa. 476, 482–84, 832 A.2d 428, 431–32 (2003); *Seaboard,* 93 Pa.Cmwlth. at 611–12, 502 A.2d at

Pursuant to Commission regulations, Chester Water Authority, which also owns facilities proximate to Cherry Farm, lodged a protest in opposition to Philadelphia Suburban's application. In this submission, the authority acknowledged the need for water service to Cherry Farm and did not challenge Philadelphia Suburban's ability and fitness to furnish such service or the company's averment concerning the expression of developer preference. The authority emphasized its own fitness, however, and contended that it was in the public interest for Cherry Farm to receive water service from it, because it stood ready, willing, and able to perform at substantially lower rates as a natural extension of its own facilities, which, in fact, were located even closer to the Cherry Farm tract than those of Philadelphia Suburban.

Following Commission procedure, Philadelphia Suburban sought, *inter alia*, judgment on the pleadings, *see* 52 Pa.Code § 5.102(a), asserting that the authority's protest simply did not bring into question the essential requisites to certification. In other words, according to Philadelphia Suburban, the Commission could freely accept as true all factual allegations made in the protest and nevertheless grant Philadelphia Suburban's application in conformity with the Public Utility Code and the Commission's long-standing interpretation. Thus, the company suggested that there was no need for a hearing on the application or protest. Philadelphia Suburban also observed that the central averment of the protest (that Chester Water Authority was capable of providing water service to the development at lower rates) was the same as that which was raised and rejected in a recent and substantially similar protest lodged by the authority to another Philadelphia Suburban application pertaining to different Thornbury Township tract, which was decided on a full hearing record.[5]

767. All parties to this appeal, however, accept the appropriateness of the Commission's traditional approach to the certification inquiry as applied to Philadelphia Suburban's application, at least in terms of the identity of the three primary, salient factors.

5. *See* Application of Philadelphia Suburban Water Company for Approval to Offer, Render, Furnish and Supply Water Service to the Public in a Portion of Thornbury Township, Delaware County, Pennsyl-

The PUC granted Philadelphia Suburban's motion, issued the requested certificate of public convenience without a hearing, and ultimately denied the authority's exceptions and efforts to obtain reconsideration.[6] The Commission's reasoning was consistent with Philadelphia Suburban's position that the allegations in the authority's protest did not raise any material issue of fact regarding the essential criteria of need, inadequacy of existing service, and fitness. In this regard, the PUC characterized as immaterial the authority's assertion of a rate differential, since it would have no impact on the final disposition of Philadelphia Suburban's application, in particular, as the Commission lacks jurisdiction to enforce rates charged by municipal authorities.[7] The PUC also noted its recent rejection of Chester Water Authority's argument in the similar application proceeding, in which the Commission had also emphasized that nothing in existing law requires an applicant for amended authority to demonstrate that its rates are the lowest among potential service providers. *See* Commission Op. at 8.

The subsequent appeal by Chester Water Authority was initially addressed by a Commonwealth Court panel, which issued a divided, unpublished opinion. *See Chester Water Auth. v. Pennsylvania PUC*, 822 A.2d 146 (Pa.Cmwlth.2002).

vania, Docket No. A–212370F0059, 96 Pa. P.U.C. 119 (Opinion and Order entered June 21, 2001), *aff'd, Chester Water Auth. v. Pennsylvania PUC*, Nos. 1649 & 1696 C.D.2001, *slip op.* (Pa.Cmwlth.Jan.22, 2002).

**6.** Chester Water Authority notes that at one point the Commission did grant reconsideration; however, this was later retracted with the explanation that the position represented the view of a staff member that erroneously had been disseminated as a PUC order, without Commission knowledge or authorization. We accept the Commission's explanation in this regard, and therefore, consider the errant order to be irrelevant to the issues presented in this appeal.

**7.** *See* Application of Philadelphia Suburban Water Company for Approval of the Right to Offer, Render, Furnish or Supply Water Service to the Public in an Additional Portion of Thornbury Township, Delaware County, Docket No. A–212370F0065, at 7 (Pa. PUC Opinion and Order entered Dec. 10, 2001) ("Commission Op.").

Under the Public Utility Code, the universe of regulated "public utilities" includes corporations, *see* 66 Pa.C.S. § 102; however, "corporation" is defined to exclude "municipal corporations," including municipal authorities such as Chester Water Authority. *Id.*

The majority concluded that the Commission properly granted judgment on the pleadings relative to the authority's protest, but that the agency should have conducted a hearing on Philadelphia Suburban's application as such before granting a certificate. Concerning the protest, the panel reasoned that the authority failed to challenge Cherry Farm's need for water service or Philadelphia Suburban's ability to supply it, but rather, implicitly acknowledged that water service was needed. Furthermore, it observed that there was no allegation in the protest refuting Philadelphia Suburban's averment that it is structurally, financially, and legally able to provide such service. Consequently, the panel determined that the protest submission effectively constituted an admission that Philadelphia Suburban was capable of sustaining its burden of proof supporting the grant of a certificate of public convenience, and therefore, the matter was appropriately resolved on the pleadings. Like the Commission, the panel treated the authority's allegation of lower-cost service as tangential to the essential certification inquiry. In concluding, however, that a hearing was required on Philadelphia Suburban's application, the majority highlighted language from Section 1103 of the Public Utility Code that prescribes, *inter alia,* that the Commission "shall hold such hearings, which shall be made public" on applications for certificates of public convenience. 66 Pa.C.S. § 1103(b). The majority also analogized the PUC certification process to proceedings on the adoption of zoning ordinances, *see Chester Water,* at 151 (citing *Appeal of Kurren,* 417 Pa. 623, 208 A.2d 853 (1965)), and the sale of public property. *See id.* at 8–9, 208 A.2d 853 (citing *In re Petition of the Bd. of Sch. Dirs. of the Hampton Tp. Sch. Dist.,* 688 A.2d 279 (Pa.Cmwlth. 1997)). President Judge Colins dissented, endorsing the Commission's position that no hearing was required, as the authority had failed to advance a dispute concerning facts pertinent to the certification criteria, and the Commission's order was both within its province and proper.

Subsequently, on applications for reargument lodged by the Commission and Philadelphia Suburban, the *en banc* Commonwealth Court altered course in a divided opinion. *See*

*Chester Water Auth. v. PUC*, 822 A.2d 146 (Pa.Cmwlth.2003). Although the *en banc* majority rejected the panel's reasoning that Section 1103 requires a public hearing on every application for a certificate of public convenience,[8] it determined that Chester Water Authority's protest had indeed raised material issues of fact that required the Commission to conduct an evidentiary hearing, and that the Commission had therefore abused its discretion by rendering judgment on the pleadings. *See id.* at 150. In particular, the majority found the averment concerning lower rates to be relevant to the "public necessity" facet of the certification inquiry, as follows:

> The propriety of permitting competition in a particular field is an administrative question for the PUC in the exercise of its discretion. Where competition is contemplated, competing rates assume greater significance. The greater significance of competing rates supports our conclusion that the issue should be addressed in a hearing.

*Id.* at 152 (citations omitted). In addition, the majority held that the Commission erred by reviewing matters outside the pleadings, including the developer's letter and Philadelphia Suburban's West Chester division rates. *See id.* at 150. Thus, the Commonwealth Court remanded for a hearing to consider Chester Water Authority's allegations concerning lower rates, closer proximity, and developer preference. President Judge Colins authored a dissent, which Judge Leavitt joined, reiterating his position from his panel dissent, which, again, tracked the Commission's essential position. *See Chester*, 822 A.2d at 153 (Colins, P.J., dissenting).

Presently, the Commission stands by the reasoning offered in support of its orders granting judgment on the pleadings relative to the authority's protest and the issuance of a

---

8. *See Chester Water*, 822 A.2d at 152 (citing *Dee–Dee Cab, Inc. v. Pennsylvania PUC*, 817 A.2d 593, 598 (Pa.Cmwlth.2003) ("When there are no disputed questions of fact and the issue to be decided is purely one of law or policy, a case may be disposed of without resort to an evidentiary hearing." (citation omitted)); *Diamond Energy, Inc. v. PUC*, 653 A.2d 1360, 1367–68 (Pa.Cmwlth.1995) (same); *Lehigh Valley Power Comm. v. Pennsylvania PUC*, 128 Pa.Cmwlth. 276, 289–90, 563 A.2d 557, 564 (1989) (same) (citing 2–3 K.C. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 12:2, 14:1–14:3 (1980))).

certificate of public convenience.[9] The Commission acknowledges that fundamental principles of due process require notice and an opportunity to be heard where an administrative agency makes a fact-based adjudication affecting property rights; however, like the Commonwealth Court panel and the *en banc* dissent, its position is that the authority's protest and the certification determination implicated solely questions of law, policy, and/or discretion, which do not require a trial-type proceeding. Thus, the PUC deems the due notice afforded, as well as the corresponding opportunity to make written submissions of which the authority advantaged itself, to represent adequate process. Additionally, the Commission attempts to invoke the doctrine of collateral estoppel based on the prior, similar certification proceedings decided on an evidentiary record. Finally, the PUC contends that the Commonwealth Court's criticism of the Commission proceedings as straying beyond the pleadings was inapt, particularly in light of the Commonwealth Court's own established precedent in *Doria v. Pennsylvania DOC,* 158 Pa.Cmwlth. 59, 630 A.2d 980 (1993), which reflects that documents properly attached to a pleading (such as the developer's letter attached to Philadelphia Suburban's application) may be considered in ruling on a motion for judgment on the pleadings. As to the West Chester division rates, the PUC notes that those are part of a Commission-approved tariff, which is a matter of public record.

Philadelphia Suburban's arguments are largely complimentary to the Commission's, but it further questions the degree to which a municipal water authority should be permitted to challenge an investor-owned utility's regulatory application to expand its service territory based upon the authority's own competitive interest. On this point, the company highlights that municipal authorities are constrained by legislatively im-

9. Appellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of procedure has occurred and whether the necessary findings of fact are supported by substantial evidence. *See* 2 Pa.C.S. § 704. As the primary issue before us involves a matter of statutory interpretation to determine whether the PUC committed an error of law, our standard of review is *de novo,* and to the extent necessary, our scope of review is plenary. *See Heath v. WCAB (PBPP),* 580 Pa. 174, 180 n. 2, 860 A.2d 25, 29 n. 2 (2004).

posed restrictions on competition with existing business enterprises. *See* 53 Pa.C.S. § 5607(b)(2) (articulating the intent of the Legislature in enabling municipal authorities was "not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises" and prescribing that "none of the powers granted [to municipal authorities] shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects ... which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes"). Philadelphia Suburban observes that the salutary purposes of these limitations reflect the unfair competitive advantage that would be enjoyed by municipal authorities, in light of their exemption from property taxation and ability to raise capital via the issuance of tax-free bonds, *see* 53 Pa.C.S. § 5620, and freedom from the substantial expense associated with regulation. According to Philadelphia Suburban, the Commonwealth Court's decision invests municipal authorities with competitive rights before the PUC that are otherwise unavailable to them in the general marketplace and extends an open invitation to authorities to use the regulatory procedure that constrains jurisdictional utilities to achieve indirectly what they cannot accomplish directly. Furthermore, the company posits that the Commonwealth Court impermissibly substituted its judgment for that of the Commission with respect to the significance that should be attributed to a claim of lower rates by a protesting municipal authority, a matter that is inherently within the ambit of the PUC's administrative expertise, and thus, its discretionary purview.

Chester Water Authority, on the other hand, reiterates the Commonwealth Court majority position that its protest raised a matter of public interest, in that it challenged Philadelphia Suburban's ability to meet an established certification criterion, namely, the need for the company's expansion of its service territory, by raising material factual questions regarding rates, orderly growth, proximity, and developer preference relative to Cherry Farm. According to the authority, the Commission's decision to accept unproven and disputed allega-

tions from the application was contrary to good order, in derogation of its rights and interests as well as those of the public at large, and violative of fundamental due process tenets. Additionally, relying on *Evansburg Water Co. v. Perkiomen Twp.*, 131 Pa.Cmwlth. 89, 569 A.2d 428 (1990), the authority takes the position that the anti-competition provisions of the Municipality Authorities Act are limited to competition with existing facilities, and therefore, do not foreclose competition over service territory expansions. Relative to the doctrine of collateral estoppel, the authority criticizes the notion that a favorable disposition of one discrete application pertaining to a particular locality, and involving particularized circumstances in terms of the identity of the developer, applicable water rates, and proximity of prospective provider facilities, forever excuses Philadelphia Suburban from hearings on its subsequent and distinct applications. Finally, Chester Water Authority cites Commission regulations indicating that hearings will be held upon the filing of the pleadings, unless waived by the parties, *see* 52 Pa.Code § 5.201, and that participants have the right to present evidence, cross-examine witnesses, object, and submit motions and argument. *See* 52 Pa.Code § 5.243(a); *accord* 66 Pa.C.S. § 332(c).

█ On review of the various views discussed above, we agree with that of President Judge Colins. At the outset, like President Judge Colins, we are in line with the Commission's position that the hearing provision of Section 1103 of the Public Utility Code does not require the Commission to hold a hearing on every application for a certificate of public convenience. Rather, the full text of Section 1103(b) proceeds as follows:

> **Investigations and Hearings.**—For the purpose of enabling the commission to make such finding or determination [i.e., the award of a certificate of public convenience], it shall hold *such hearings,* which shall be public, and, before or after hearing, it may make such inquiries, physical examinations, valuations, and investigations, and may require such plans, specifications, and estimates of cost, *as it may deem*

*necessary or proper in enabling it to reach a finding or determination.*

66 Pa.C.S. § 1103(b) (emphasis added). While one could conceive an argument that the qualifying language "as it may deem necessary or proper in enabling it to reach a finding or determination" pertains only to the clause that immediately precedes it (the requirement of plans, specifications and estimates of costs), this would not explain the General Assembly's parallel usage of the qualifier "such" in conjunction with each of the preceding clauses, including the relevant one prescribing the conduct of hearings.[10] In light of this usage, the Commission's long-standing interpretation—that it may, within the limits of sound administrative discretion, award certificates of public convenience without the necessity of a public hearing—is supported by the statutory language.

Nor do we believe that due process of law requires a hearing on every application for a certificate of public convenience. In the first instance, constitutional procedural due process is a flexible concept, and thus, implicates procedural protections as each particular situation demands. *See Burger v. Board of Sch. Dirs. of McGuffey Sch. Dist.*, 576 Pa. 574, 586, 839 A.2d 1055, 1062 (2003). The certification setting entails a unique regulatory process via which the General Assembly has imposed requirements upon certain utility service providers that would otherwise be subject only to dictates of the competitive marketplace and general law, along the lines of unregulated business activity. In this setting, while due process concerns implicating hearings certainly may arise in the course of particular certification proceedings, we do not regard the act of regulatory approval itself as the type of government activity that inherently requires a hearing to comport with constitutional doctrine.[11]

10. Indeed, if the hearing proviso were deemed to be independent of the qualifying clause, a literal interpretation would require that the Commission conduct more than one hearing on each application, since plural form of the noun "hearing" is employed in the statute. Recognizing the discretionary aspect of the hearing procedure obviates such a questionable requirement.

11. Correspondingly, in light of the unique nature of the certification inquiry, we reject the Commonwealth Court panel majority's analogy to

Further, we do not read the other statutory provisions and regulations cited by the authority as requiring a hearing on every application for regulatory certification. First, with regard to the statutory provisions, Section 1103 is the most specific to certification proceedings; therefore, to the extent that another provision would seem to require a hearing, Section 1103's conferral of discretion upon the Commission controls. *See* 1 Pa.C.S. § 1933 (prescribing that special statutory provisions are to be deemed controlling over conflicting general provisions). The PUC regulations that the authority cites reflect general hearing practice, including the affordance to "participants" of the opportunity to have an active role, and there is no dispute that when a hearing is available, these procedures control. Since, however, both the enabling statute and the regulations also contemplate situations in which hearings are not required, *see, e.g.,* 52 Pa.Code § 5.102(a), the hearing regulations are not properly read to require a hearing in every instance.

 As we have concluded that the Commission is not required to conduct a hearing in every certification proceeding, it remains to consider whether the Commission abused its discretion under Section 1103 in declining to conduct one here, and relatedly, if in the particular circumstances of this case, due process considerations required one. In this regard as well, we agree with President Judge Colins that the PUC did not exceed the limits of its discretion.

 First, as the Commission emphasizes, the authority's challenge to certification was couched in terms of its own fitness and ability to provide water service to Cherry Farm at lower rates. In the exercise of its administrative discretion, the Commission has chosen to accord little or no weight in certification proceedings to the fitness of, or rates charged by, a municipal authority seeking to thwart a jurisdictional utility's efforts to obtain regulatory approval, at least in part because the PUC lacks regulatory control over services by and

proceedings involving the adoption of zoning ordinances and sales of public property. *See supra.*

rates charged by municipal authorities. Considerable deference is due to the Commission's administrative expertise in such decisions. *Accord Elite Indus.*, 574 Pa. at 481, 832 A.2d at 431 (observing that "courts may not disturb the commission's interpretation regarding a certificate of public convenience unless the result is clearly erroneous, arbitrary, and unsupported by substantial evidence"); *Philadelphia Suburban Water Co. v. Pennsylvania PUC*, 425 Pa. 501, 512, 229 A.2d 748, 754 (1967) ("[n]ether this Court nor the Superior Court ... was intended by the Legislature to weigh the various factors entering in the granting of a certificate of public convenience and necessity by the [C]ommission"). Moreover, as Philadelphia Suburban argues, such practice on the part of the Commission does seem consistent with the General Assembly's expression of concern, manifested in the Municipality Authorities Act, over competition between municipal authorities and established business enterprises. *See* 53 Pa.C.S. § 5607(b)(2). While the subject of increased competition for new service territory between municipal authorities and jurisdictional utilities appears to be a relatively new development which may warrant specific attention by the Legislature, we cannot say that the Commission's policy, maintained in the absence of such specific legislative focus, is a clearly erroneous or arbitrary one.[12]

■ Second, as the Commonwealth Court has generally maintained, as a matter of constitutional due process, an

---

12. In this regard, although we agree with the authority that the doctrine of collateral estoppel is not directly controlling, it is significant, in our view, in terms of the Commission's exercise of its discretionary prerogative in deciding whether or not to conduct a hearing, that less than two months prior to the filing of the present application, the PUC considered a similar rate-based challenge by the authority to a Philadelphia Suburban application on the merits on a full hearing record. Thus, the authority recently benefited from the opportunity to fully develop its case before the Commission to the effect that differential rates as between municipal authorities and jurisdictional utilities should be deemed a relevant (and indeed controlling) factor in the certification inquiry. Indeed, the authority's present effort is primarily dedicated to challenging this aspect of Commission policy; the advancement of matters that by their nature are suitable to development at an evidentiary hearing (in terms developer preference, specific rates, and proximity of facilities) appears to be merely collateral to this effort.

evidentiary hearing is most often implicated where there are material facts in dispute. *See supra* note 8. Here, since the Commission was able to accept the material factual allegations of the authority's protest as true, a due process hearing was not essential, and the use of the procedure for judgment on the pleadings relative to the protest was not inappropriate.

We do note that, had the authority challenged the accuracy of Philadelphia Suburban's averment concerning the developer's initial preference in its protest pleading, judgment on the pleadings would not have been appropriately rendered, because the Commission apparently considered this factor material to its certification decision, and judgment on the pleadings is appropriate only upon acceptance of the material facts asserted in the non-moving party's pleading. *Accord Travelers Cas. & Sur. Co. v. Castegnaro*, 565 Pa. 246, 251, 772 A.2d 456, 459 (2001). The protest, however, made no such factual averment, but again, was predicated on the authority's own fitness and ability to provide lower-cost service.[13] Moreover, in light of Section 1103, requiring only such hearings as the Commission deems necessary and proper in enabling it to make its determination, we have no difficulty with the Commission's acceptance of an uncontested averment supported by attached documentation in terms of the certification decision itself. Similarly, the protest offered no contest to Philadelphia Suburban's allusion to its West Chester division rates, which in any event, were a matter of public record, and the Commission appears to have accepted as true the authority's averment regarding the incrementally closer location of its facilities in

13. Even when the authority later addressed the issue of developer preference in its response to Philadelphia Suburban's motion for judgment on the pleadings and in the exceptions to the Commission's disposition of the protest and application, it framed its affirmative assertions in terms of whether the developer "currently" or "now" desired the service, *see* R.R. at 51a, 71a–72a, rather than specifically controverting the material allegation of the application concerning initial developer preference. As Philadelphia Suburban has noted, it is understandable that the developer's decision may have changed during the course of the contested certification proceedings in light of the associated delay. For this reason in particular, we find that the PUC acted reasonably in declining to look beyond the pleadings themselves in rendering a summary decision on the protest.

rendering judgment on the pleadings relative to the protest, and in the certification award.

In summary, like President Judge Colins, we credit the Commission's position that it accepted as true the authority's factual allegations (centrally, the averment that a capable and fit municipal authority wished to provide lower-cost service) in granting judgment on the pleadings relative to the authority's protest. Further, we discern no abuse of Commission discretion in the grant of a certificate of public convenience to Philadelphia Suburban without a hearing, where the uncontested averments of the company's application were sufficient to reflect a demand and need for the service (as this inquiry has been interpreted by the Commission to require little or no significance to be given to a municipal authority's challenge grounded primarily on differential rates), the inadequacy of existing facilities, and technical, financial and legal fitness.

The order of the Commonwealth Court is reversed and the matter is remanded for reinstatement of the Public Utility Commission's order. Jurisdiction is relinquished.