EUSTER, Eugene H.; Fieramosca, Samuel; Lopez, Daniel; Hasbany, David; and Fallon, Martin J. Jr., Appellants,

v.

EAGLE DOWNS RACING ASSOCIATION, a Pennsylvania Corporation; Pennsylvania Horse Racing Commission; Johnson, Andrew R., Chairman of Pennsylvania Horse Racing Commission; and A. Marlyn Moyer and William D. Gross, Commissioners of the Pennsylvania Horse Racing Commission, Appellees.

No. 81–2432.

United States Court of Appeals, Third Circuit.

Argued March 2, 1982.

Decided May 17, 1982.

Rehearing and Rehearing In Banc Denied June 24, 1982.

James J. Rodgers (Argued), Richard P. Brown, Jr., Joseph B. G. Fay, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants.

David H. Allshouse (Argued), Deputy Atty. Gen., Leroy S. Zimmerman, Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Chief, Civil Litigation, Harrisburg, Pa., for appellees.

Jon A. Baughman (Argued), Thomas B. Schmidt, III, Nancy J. Gellman, Richard M. Bernstein, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for amicus curiae Jockeys' Guild, Inc.

Before HUNTER, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of Pennsylvania granting defendants' motion for summary judgment. Plaintiffs-Appellants are owners and trainers of thoroughbred race horses in Pennsylvania. They brought this antitrust action against the Pennsylvania Horse Racing Commission (the "Commission") and its members challenging the Commission's rule which sets the fees to be paid to jockeys who ride at racetracks in the Commonwealth. Specifically, plaintiffs allege that the rule violates Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Defendants moved for summary judgment in the district court, pursuant to Fed.R.Civ.P. 56, on the ground that the "state action" exception to the antitrust laws enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) precludes Commission liability.[2] The district court entered an order and judgment, supported by a memorandum opinion, granting the motion for summary judgment. We will affirm.

## FACTS AND PROCEDURAL HISTORY

The Pennsylvania legislature enacted the Pennsylvania Horse Racing Act in 1967. 15 P.S. §§ 2651–2675 (1980). The Pennsylvania Horse Racing Commission was established pursuant to this Act and was given broad authority over horse racing and betting:

> Pursuant to the provisions of this act, the State Horse Racing Commission shall have power to supervise generally all thoroughbred horse race meetings in this State at which pari-mutuel betting is conducted. The commission may adopt rules and regulations not inconsistent with this act to carry into effect its purposes and provisions and to prevent circumvention or evasion thereof.

15 P.S. § 2652(a) (1980). The present appeal focuses on one such rule, Rule of Racing 9.15 ("Rule 9.15"). Rule 9.15 contains a jockey fee scale which was initially promulgated by the Commission in 1968 and was amended in 1978 to increase the schedule of fee payments. Appendix at A–22.

Shortly before this action was filed in the district court, the Pennsylvania Division of the Horseman's Benevolent and Protective Association, which represents owners-trainers of racing horses at various tracks in Pennsylvania, and three other individuals filed a lawsuit in the Commonwealth Court of Pennsylvania challenging the authority of the Commission to promulgate a rule setting the fees to be paid to jockeys. The Commonwealth Court held that the Commission exceeded its legislative authority and could not regulate the amount of compensation paid to jockeys. *Gilligan v. Pennsylvania Horse Racing Commission*, 46 Pa. Commw.Ct. 595, 407 A.2d 466 (1979). After

---

**1.** 15 U.S.C. § 1 states in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony....

**2.** Defendants also premised their summary judgment motion on the ground that the injunctive and monetary relief sought against the Commission and its members was barred by the Eleventh Amendment. Because the district court granted summary judgment on the basis of the *Parker* doctrine, it did not reach the question of whether the Eleventh Amendment barred the lawsuit. Neither do we.

the Commonwealth Court's decision, the district court rejected the defendants' argument that the state action exemption of *Parker* applied, relying on the decision of the Commonwealth Court in the *Gilligan* case.

The Commission then appealed the Commonwealth Court's decision to the Supreme Court of Pennsylvania. In September 1980, the Supreme Court reversed the Commonwealth Court, holding that the Commission was authorized by the legislature to promulgate a jockey fee schedule. *Gilligan v. Pennsylvania Horse Racing Comm'n*, 492 Pa. 90, 422 A.2d 487 (1980). In light of the decision of the Pennsylvania Supreme Court, holding unambiguously that the Commission had authority to set jockey's fees, the district court held that the defendants were immune from antitrust liability under the *Parker* doctrine.

*DISCUSSION*

In *Parker,* the United States Supreme Court held that the Sherman Act was inapplicable to certain state action.[3] A raisin packer sued the California State Agricultural Commission to enjoin enforcement of the State's Agricultural Prorate Act. That Act authorized the State Director of Agriculture and the Agriculture Commission to adopt marketing programs regulating the sale of certain produce. The plaintiff attacked the program as violative of the Sherman Act. The Supreme Court held that state regulatory programs were immune from the proscriptions of the Sherman Act. The Court found no language or legislative history of the Sherman Act indicating congressional intent to proscribe the behavior of a sovereign state. The Court held that state regulatory programs could not violate the Sherman Act because the Act is direct-

ed against "individual and not state action." *Id.* 317 U.S. at 352, 63 S.Ct. at 314.

■ The *Parker* doctrine was recently discussed and reaffirmed in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In *Midcal,* the Supreme Court set forth the appropriate standards for the state action exception as follows:

First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

445 U.S. at 105, 100 S.Ct. at 943. If these two standards are satisfied, the challenged restraint is immunized from antitrust liability.

■ The *Midcal* requirements are satisfied in the case before us. The ruling of the district court is amply justified by the Pennsylvania Supreme Court's decision in *Gilligan.*[4] In *Gilligan,* the court held that the Commission was authorized by the Horse Racing Act to promulgate the jockey fee scale at issue in this case. The court stated explicitly that the Act reflected a "clear legislative policy" to vest the Commission with broad supervisory powers over the "previously unlawful activity of thoroughbred horse racing." 422 A.2d at 489. The court stated:

A pervasive system of regulation and supervision of the *otherwise criminal activity* was thus contemplated by the Commission's broad legislative mandate, and a general rule making power was clearly and unmistakably conferred.

422 A.2d at 490 (emphasis in original).

Furthermore, the court observed that the rulemaking powers of the Commission

---

3. For a discussion of the historical background and origins of *Parker*, see Handler, "The Current Attack on the *Parker v. Brown* State Action Doctrine," 76 *Colum.L.Rev.* (1976). *See also* P. Areeda & D. Turner, 1 *Antitrust Law* 67-69 (1978); L. Sullivan, *Antitrust* 732-34 (1977).

4. The Supreme Court has repeatedly held that the highest court of a state is the ultimate interpreter of the state's statutes and that a federal court is bound by its construction.

*Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 1885, 44 L.Ed.2d 508 (1975); *American Railway Express Co. v. Kentucky*, 273 U.S. 269, 272, 47 S.Ct. 353, 354, 71 L.Ed. 639 (1927). State decisions are also controlling with respect to the interpretation of state administrative orders. *Sutter Butte Canal Co. v. Railroad Comm'n*, 279 U.S. 125, 139, 49 S.Ct. 325, 328, 73 L.Ed. 637 (1929). We are therefore bound by the Pennsylvania Supreme Court's holding that the Horse Racing Commission was authorized by the legislature to fix jockey fees.

should be construed liberally in light of the broad supervisory task necessary to accomplish the express legislative purpose:

> The breadth of the Commission's powers is required for the prevention of corruption and the maintenance of high standards and public confidence in racing. *The imposition of a jockey fee schedule is simply part of a comprehensive scheme of regulation consistent with—indeed, necessary to accomplish these legislative goals.*

422 A.2d at 490–91 (emphasis added).

The Pennsylvania Supreme Court also attached importance to the fact that when the legislature amended the Horse Racing Act in 1976, including the section enumerating the powers of the Commission, there was no attempt by the legislature to curtail the Commission's authority to set jockey fees, authority which it had been exercising since 1968. Thus, the court concluded that "the legislature's acquiescence in the Commission's exercise of its rule-making power to set jockeys' fees manifests approval thereof." 422 A.2d at 491.

In *Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706, 717 (3d Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978) we discussed the problem of discerning when state authority to restrain competition exists. We noted that:

> [T]he state need not have contemplated the precise action complained of as long as it contemplated the kind of action to which objection was made.

As the *Gilligan* decision demonstrates, the action complained of in this case was clearly contemplated by the legislation in question. Indeed, in this regard *Gilligan* could not have been more explicit.[5]

It is also clear that the jockey fee scale is "actively supervised" by the Commonwealth, within the meaning of that term as set forth in *Midcal.* In *Midcal,* the Supreme Court struck down the California wine-pricing system because the state neither established the prices, reviewed their reasonableness, regulated the terms of the fair trade contracts, monitored market conditions, nor engaged in any "pointed reexamination" of the program in question. 445 U.S. at 105–06, 100 S.Ct. at 943. The *Midcal* Court stressed that the state simply authorized price-setting and enforced the prices established by private parties. The Court made clear its concern: "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Id.* 445 U.S. at 106, 100 S.Ct. at 943.

In the instant case, however, there is no question about the Commonwealth's involvement in the challenged activity. The state Commission sets the jockey fees, pursuant to formal notice and hearing procedures. Appendix at 22. Furthermore, the Complaint does not allege a need for more state supervision; it alleges that the present supervision is biased in favor of the jockeys and that the Commission did not exercise sufficient independent judgment

---

**5.** The degree of articulation and expression by the legislature that is necessary was also stated in *City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434–35 (5th Cir. 1976), *aff'd,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978):

> [I]t is not necessary to point to an express statutory mandate for each act which is alleged to violate the antitrust laws. It will suffice if the challenged activity was clearly within the legislative intent. Thus, a trial judge may ascertain, from the authority given a governmental entity to act in a particular area, that the legislature contemplated the kind of action complained of.

Cited in *Community Communications Co., Inc. v. City of Boulder,* —— U.S. ——, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (footnote omitted). In *Lafayette,* the Court considered an antitrust counterclaim against two Louisiana cities that allegedly pursued various anticompetitive activities in their operation of electric power companies. The Court agreed that Congress did not intend to exempt local governments per se from antitrust scrutiny. Justice Brennan noted that municipal decisions might express only "purely parochial interests" rather than state policy. 435 U.S. at 416, 98 S.Ct. 1138. That concern is not presented in the case of a state agency responsible for articulating statewide policy. *See, e.g., Metropolitan Edison Co. v. Public Service Comm'n,* 127 Pa.Super.Ct. 11, 191 A. 678 (1937). For a general analysis of the *Lafayette* decision, *see* Areeda, "Antitrust Immunity For 'State Action' After *Lafayette,*" 95 *Harv.L.Rev.* 435 (1981).

over the level of the fee scale. Complaint §§ 19 and 26. Appendix at A–10, A–11, A–12. The record does not support such an assertion. However, even if this averment were true, the promulgation of a jockey fee scale by means of Rule 9.15 differs from the scheme which the Supreme Court struck down in *Midcal.* In *Midcal,* private parties were authorized to set prices by themselves, without the further involvement of the state. Here, the regulation promulgated by the Commission itself contains the fees. There is no such abdication of price-fixing activity to private parties by the Horse Racing Commission. It is the state Commission itself which sets the fees.[6]

The authorities relied upon by appellants are not persuasive in the present context. In many of these cases, the challenged restraint had not been clearly articulated as state policy. For example, in *Cantor v. Detroit Edison Co.* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), defendant Detroit Edison gave its customers light bulbs as part of their electric service, and thereby, plaintiffs argued, restrained trade in the sale of light bulbs. The Supreme Court held that Detroit Edison was not exempt from the antitrust laws under the state action doctrine. The plurality attached great significance to the fact that the defendant was a private party, not a state agency or official. 428 U.S. at 591, 96 S.Ct. at 3117. The plurality also ruled that the decision to provide light bulbs was primarily that of the defendant, and not of the Michigan Public Service Commission, and that the state had no regulatory interest in distributing light bulbs. *Id.* at 584–85, 96 S.Ct. at 3114–15. The Michigan statute gave the state Public Service Commission "complete power and jurisdiction to regulate all public utilities in the state," but the statute did not say whether a utility should or should not engage in the challenged conduct, *i.e.,* the free distribution of light bulbs, and did not otherwise manifest a regulatory interest in the light bulb market. *Id.* at 584–85, 96 S.Ct. at 3114–15. These facts are clearly distinguishable from the case before us. Here, the precise challenged restraint, setting the jockey fee scale, falls within a "general rule making power ... clearly and unmistakably conferred" by the legislature and which the Commonwealth's highest court has deemed "necessary to accomplish" the goals identified by the legislature in passing the Horse Racing Act. *Gilligan,* 422 A.2d at 490–91.

*Stauffer v. Town of Grand Lake* 1981–1 Trade Cases ¶ 64,029 (D.Colo.1980), also relied upon by appellants, is inapposite as well. In *Stauffer,* the court noted that

---

**6.** The recent Supreme Court decision in *Boulder* is not controlling here. In *Boulder,* the Court held that an ordinance of the City of Boulder, a "home rule" municipality with extensive powers of self-government in local and municipal matters, which restricted the expansion of a cable television business for three months, was not exempt from antitrust scrutiny under the state action exemption of *Parker.* In this case, we are faced with the question of whether a state agency, not a municipality, is entitled to the *Parker* exemption when it acts within its authority under state law. Here, the Pennsylvania Supreme Court has expressly held that the action of the Horse Racing Commission in promulgating a fee schedule for jockeys is within the *sovereign authority* of the Commission under *state* law. The importance of such a distinction was implicitly recognized by the Court in *Boulder* in its discussion of the two situations in which the state action exemption applies:

Our precedents thus reveal that Boulder's moratorium ordinance cannot be exempt from antitrust scrutiny *unless it constitutes*

*the action of the State of Colorado itself in its sovereign capacity, see Parker,* or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, *see City of Lafayette, Orrin W. Fox Co.,* and *Midcal.* —— U.S. at ——, 102 S.Ct. at 839–841 (emphasis added).

Thus, the Court in *Boulder* noted that the *Parker* exemption reflects Congress' intention to embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under the federal Constitution. The Court noted that this principle is inherently limited in that "we are a nation of *States,* a principle that makes no accommodation for sovereign subdivisions of states." —— U.S. at ——, 102 S.Ct. at 839 (emphasis in the original). *Boulder* is instructive in this case insofar as it supports the proposition that interpretation of legislative intent is a matter of state law and that federal antitrust courts should defer to state court interpretations of such questions. —— U.S. at —— nn.15 & 16, 102 S.Ct. at 841 nn. 15 & 16.

while a zoning board had broad statutory authority to regulate land use "for the purpose of monitoring health, safety, morals or the general welfare of the community," the Colorado legislature "did not foresee, contemplate or intend" that zoning officials would engage in the conduct complained of in that case: use of their zoning authorization to promote their own interests and economic benefit. *Id.* at 76,330. In the present case there is no allegation to the effect that the Commission defendants used their authorization to promote their own personal and economic interests.

Appellants also argue that there are factual disputes in this case which should have prevented the district court from entering summary judgment and that they should have been given an opportunity for discovery. Both claims are without merit.

First, the state action exemption cases clearly indicate that this issue involves a question of law, generally an issue of statutory construction. Thus, the question of whether a governmental entity is subject to Sherman Act liability has generally been resolved on a motion to dismiss or a summary judgment motion. *See, e.g., Princeton Community Phone Book,* 582 F.2d 706. In the present case, any factual disputes that exist are on matters which are irrelevant to the issue before us: the applicability of the *Parker* doctrine. Second, it is important to note that this case had been pending in the district court for over two years before the summary judgment motion was filed. Plaintiffs chose, however, not to take any discovery in over two years of litigation; rather, they chose to rest on the allegations of the complaint in responding to the summary judgment motion.

 Finally, appellants argue that the decision in the *Gilligan* case lacks an adequate factual basis and that the Commission never properly explained how its fee schedule deters criminal influence on thoroughbred horse racing. The state ac-

tion doctrine was developed to avoid this sort of inquiry by federal courts into state legislative wisdom. In *Parker* itself, for example, the Supreme Court did not inquire into the necessity for, or wisdom of, the California marketing programs regulating the sale of certain produce, holding simply that these programs were immune from attack under the antitrust laws. Again, in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court held that the policy of restricting lawyer advertising was affirmatively expressed and actively supervised by the state and thus not subject to antitrust attack. However, the Court did not inquire into the wisdom of this policy. In *Bates,* the Court considered the necessity of the policy; but it did so only to determine whether the state had a compelling interest which could not be advanced by some other means which were less intrusive into the first amendment rights involved in that case. *Id.* at 363–79, 97 S.Ct. at 2698–2706.

The application of the *Parker* doctrine requires a federal court to make only the two determinations articulated in the *Midcal* decision: whether the scheme in question is a clearly articulated state policy and whether it is actively supervised. The district court would not be justified in looking into the wisdom or efficiency of using the regulation in question as a means of accomplishing the intended objectives.[7]

## CONCLUSION

19. For the foregoing reasons, the judgment of the district court will be affirmed.

---

**7.** Appellants also argue the existence of disputed issues of material fact respecting the motivation behind the Commission's amendment of Rule 9.15 in 1978. Again, discovery on this issue would serve no purpose. The Supreme Court has never held that motivation is a factor in the "state action" analysis, apart from the standards outlined in *Midcal.* Furthermore, this theory was not alleged in the Complaint. Appendix at 5–20.