Aristides **MARTINEZ,** Plaintiff,

v.

**NATIONAL BROADCASTING COMPANY, et al.,** Defendants.

Civ. A. No. 92–2477 (HAA).

United States District Court, D. New Jersey.

Dec. 13, 1994.

Ann F. Kiernan, Jamieson, Moore, Peskin & Spicer, Princeton, NJ, for plaintiff.

David W. MacGregor, Proskauer Rose Goetz & Mendelsohn, Clifton, NJ, for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court today upon a motion by defendants, the National

Broadcasting Company, Inc. ("NBC") and its subsidiaries, WNBC–TV, WRC–TV, and CNBC,[1] for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons detailed below, defendants' motion is granted in part and denied in part.

## I. Factual and Procedural Background

Plaintiff Aristides Martinez is a Hispanic man who was born in Bogota, Columbia on July 5, 1937. He has been a member of the National Association of Broadcast Employees and Technicians, AFL–CIO ("NABET") since 1972.

Plaintiff held various temporary jobs at NBC between 1973 and 1986. These temporary positions consisted of filling in for permanent employees who were either on vacation or on leave of absence. During this period, plaintiff worked for both the NBC Television Network and WNBC–TV, both of which are located in New York.

Plaintiff was first permanently employed by WRC–TV and NBC News in Washington, D.C., on July 5, 1986 in a videotape editing position. Specifically, he was hired to work on a news magazine show entitled "1986." This show was cancelled by NBC in December of 1986. Following the cancellation, plaintiff, along with three other editors, was reassigned to NBC News' Washington operations. While working in this new position, plaintiff claims he was retaliated against and ostracized because his transfer as a permanent employee resulted in the loss of jobs for several temporary employees and because of his ethnicity. Plaintiff also claims that while at NBC News, William Krebs, a NBC News studio director, assaulted him verbally with derogatory and ethnic remarks.

In early 1987, plaintiff was assigned to perform the task of playback operator—the person who plays back the news stories during the national news programs. While performing this task for NBC Nightly News, plaintiff admittedly made two mistakes. The first mistake resulted in a blank television screen for approximately two to three seconds during a Nightly News broadcast. The other mistake resulted in the playing of a story without the accompanying audio narration for approximately two to three seconds. However, plaintiff asserts that these mistakes were the result of unfair and discriminatory treatment by Krebs, who "intentionally, set [plaintiff] up, in disregard of proper technical procedures, to make over-the-air mistakes, in order to have a justification to criticize [plaintiff]." Martinez Cert. at ¶ 23. Plaintiff claims that the mistakes were the result of Krebs' failure to properly cue the plaintiff. Plaintiff also claims that, during this time period, NBC failed to provide him with an editing room and the necessary equipment to do his job.

Around July 30, 1987, NABET production personnel, including plaintiff, went out on strike. During the strike, Employee Relations in Washington undertook an evaluation of work force needs and determined that the work force at NBC in Washington should be reduced. After the strike, on October 30, 1987, seventeen NABET employees were laid off in reverse order of seniority by NBC in Washington. Plaintiff had low seniority because he was first hired by NBC News in Washington only one year before, and therefore, he was laid off. Plaintiff does not dispute that this layoff was solely the result of his low seniority.

As a member of NABET, plaintiff was entitled to "recall rights" for a period of three years following his employment with NBC. Recall rights provide that to the extent that NBC in Washington needed to hire anyone new, it was obligated to first recall those employees who were laid off and who had not accepted a buy-out.

After his layoff, plaintiff applied for various "daily-hire" and temporary positions with NBC. Plaintiff claims that each time he was rejected without justifiable reason. During

---

1. WNBC–TV is a local New York television station which is owned and operated by NBC and broadcasts local news programs. WRC–TV is a local Washington, D.C. television station which also owned and operated by NBC and also broadcasts local news programs. CNBC, Inc. is a cable television network that is a wholly-owned subsidiary of NBC. Lastly, NBC News is a division of NBC and is the entity responsible for the reporting of the national news and other network news programs.

the spring of 1988, plaintiff attempted to show that alleged claims of incompetence by Krebs and William Chesleigh, a network news producer, were false and inaccurate. Plaintiff approached Tom Wolzien, vice-president of editorial services, and complained that there was evidence of discrimination in the NBC News New York and Washington units where he had once worked. Eventually, Brander Pettway, the then-vice president of NABET Local 31, wrote to Mr. Wolzien on plaintiff's behalf. Pettway's letter stated that he was present when the mistakes were made on Nightly News and that plaintiff was getting a "bum rap." Martinez Cert. at ¶ 25.

Beginning late October of 1988, plaintiff attempted to obtain employment at CNBC, Inc., which is a wholly-owned subsidiary of NBC. Plaintiff never gained employment with CNBC and claims that CNBC has given preferential treatment to far less experienced, white, non-Hispanic, younger applicants.

In his pursuit of employment at CNBC, plaintiff informed Nelson Rosabal, CNBC's vice president for personnel and who is Hispanic, that he had worked for NBC in Washington. Thus, Rosabal called Paul Besson, the Director of Employee Relations for NBC in Washington to determine if plaintiff would be recommended for employment should any openings become available. Besson informed Rosabal that plaintiff's supervisor in Washington, Ronald Knox, did not think his work was good enough to merit rehire. Knox based this opinion on statements by Cindy Bickford, who was at one time plaintiff's supervisor, that plaintiff was not an able documentary editor because he was very slow at operating the equipment. In addition, after Ms. Bickford left NBC, Knox became plaintiff's supervisor and observed him make several mistakes and have problems with technical equipment. Rosabal claims that based on this conversation with Besson, he concluded that he would not consider plaintiff for an engineering or tape editor's position should any openings occur. Plaintiff claims that Knox's conclusions about his work are false.

In March 1990, Paul Besson forwarded a letter to all former NBC employees, including the plaintiff, who were laid off from NBC's Washington, D.C. office on October 30, 1987. Besson's letter made an offer to buy out each former employee's recall rights under the NABET–NBC Master Agreements in exchange for money and the execution of a General Release by each employee as to NBC. The Release provided, in general, that NBC was discharged from any claims that plaintiff may have against NBC "in connection with any matter arising out of my employment with NBC, the termination of my service of NBC, or with respect to any matter arising from the failure of NBC or GE to continue my employment." The release specifically referred to claims of discrimination. Following several communications between the plaintiff and employees of NBC, plaintiff signed the release. Plaintiff claims that Besson and Ellie Larson assured him of work if he signed the release; defendants dispute this claim.

After signing the release, plaintiff continued to attempt to gain employment from CNBC.

In March of 1991, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against CNBC for its failure to hire him. The EEOC found no probable cause to support plaintiff's claims.

On March 20, 1992, plaintiff filed a *pro se* complaint against NBC and CNBC alleging various grounds for relief. On June 29, 1992, plaintiff filed an amended complaint against NBC, WNBC–TV, WRC–TV and CNBC. Defendants answered the complaint and now move for summary judgment. Lastly, it should be noted that plaintiff has since retained an attorney.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Todaro v.*

*Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dism'd,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843 F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

■ The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

■ The party seeking summary judgment always bears the initial burden of production, i.e., of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. at 2552–53. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. at 2553.

■ However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations— these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1330 (3d Cir.1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id. See also Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

If the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law, then summary judgment may be granted.

### III. Discussion

There are a number of claims which are at issue in this motion. Plaintiff's claims, as represented to the court at oral argument (*see* Tr. of 12/5/94, at 20–21) [2], are as follows: 1) plaintiff claims that CNBC engaged in discriminatory hiring practices when they failed to hire him after he was laid off in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e to 2000e–17, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1 to 10:5–42; 2) plaintiff claims that NBC is liable under the LAD for failure to hire [3]; 3) plaintiff asserts hostile work environment claims against NBC, WNBC–TV, and WRC–TV under the LAD; and 4) plaintiff claims he was defamed.

---

2. Prior to oral argument it was unclear whether plaintiff was also asserting a claim for the common law tort of intentional infliction of emotional distress. However, at oral argument plaintiff's counsel represented to the court that plaintiff was not asserting a separate claim for intentional infliction of emotional distress. The plaintiff is merely requesting damages for infliction of emotional distress under the New Jersey Law Against Discrimination. *See* Tr. of 12/5/94, at 19.

3. At oral argument, plaintiff's attorney also stated that plaintiff was asserting a failure to hire claim under the LAD against WNBC–TV. However, no where in plaintiff's amended complaint, filed on June 22, 1994 does such a claim appear and plaintiff has not adduced facts to support such a claim. Therefore, the court will not address this claim.

In addition, defendants argue that most of plaintiff's claims are barred by his execution of the general release. Therefore, I will address that issue first, then I will address each of plaintiff's claims in turn.

### A. The General Release.

Defendants first argue that summary judgment should be granted on all of plaintiff's claims that arose prior to April 5, 1990—the date plaintiff executed the Release. Plaintiff argues that the Release should not be given effect because he was induced to sign the release with fraudulent promises of future employment.

■■■ A waiver of claims of discrimination under Title VII and the ADEA is only valid if the waiver was knowing and willful. *See Cirillo v. Arco Chemical Co.*, 862 F.2d 448, 451–54 (3d Cir.1988); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 521–25 (3d Cir. 1988); *Ponzoni v. Kraft General Foods, Inc.*, 774 F.Supp. 299, 309 (D.N.J.1991), *aff'd*, 968 F.2d 14 (3d Cir.1992). To determine whether an employee has executed a release knowingly and willfully, the Third Circuit has adopted a "totality of the circumstances" test. *Coventry*, 856 F.2d at 524; *Ponzoni*, 774 F.Supp. at 309. The factors to be considered in the analysis include, but are not limited to

(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

**4.** In the case of the ADEA, the fourth element of the prima facie case may also be satisfied if the plaintiff shows that the employer ultimately filled the position with someone sufficiently younger to

*Cirillo*, 862 F.2d at 451. In addition, general principles of contract construction, specifically the absence of fraud or undue influence, are also applicable in determining the validity of a waiver. *See Coventry*, 856 F.2d at 522.

■■■ In the case before the court, plaintiff argues that he was induced to sign the release with fraudulent promises of future employment. Plaintiff's testimony at his deposition wherein he states that he understood that he would gain employment if he signed the release raises a genuine issue of material fact concerning the validity of the release. Therefore, the court is precluded from granting summary judgment based on the release.

### B. Failure to Hire.

■■■ The burdens of proof and production for discrimination claims arising under Title VII, the ADEA, and the LAD are the same. *See Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221, 1225 n. 6 (3d Cir.1994) (Title VII and the ADEA); *McKenna v. Pacific Rail Service*, 32 F.3d 820 (3d Cir.1994) (predicting that the New Jersey Supreme Court would incorporate principles enunciated in *St. Mary's Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) into its LAD jurisprudence).

■■■ In a case of failure to hire under Title VII, the ADEA, or the LAD, the plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

This may be done by showing (i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[4]

permit an inference of age discrimination. *See Fowle v. C & C Cola, a Div. of ITT–Continental Baking Co.*, 868 F.2d 59, 61 (3d Cir.1989), *abro-*

*Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). *See also Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 550, 569 A.2d 793 (1990) (same elements of prima facie case under the LAD).

 Once a plaintiff makes out a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment decision. *Id.* The employer can satisfy its burden of production by introducing evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. *Id.* The employer need not prove that its tendered reason actually motivated its behavior, because "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* Once the employer meets its burden, the burden of production rebounds to the plaintiff, who must then "show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.*

 At trial, the plaintiff must convince the factfinder " 'both that the reason was false, *and* that discrimination was the real reason.'" *Id.* (quoting *Hicks,* —— U.S. at ——, 113 S.Ct. at 2754) (emphasis in original). If the employer's proffered, legitimate reason is rejected, the factfinder is permitted, but not compelled to find for the plaintiff. *Id.* (citing *Hicks,* —— U.S. ——, 113 S.Ct. at 2749). "The test is whether the plaintiff ultimately persuades the factfinder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the factfinder's rejection of the employer's proffered evidence are circumstantial evidence of unlawful discrimination." *Id.* (citing *Hicks,* —— U.S. ——, 113 S.Ct. at 2749).

 To prevail at trial, the plaintiff need not prove that the "illegitimate factor" was the sole reason for the decision. *Id.* at 764. The plaintiff only has to prove that the "illegitimate factor" was a determinative factor in the adverse employment decision, "that is,

but for the protected characteristic, the plaintiff would have been hired (or promoted)." *Id.* (citing *Hazen Paper Co. v. Biggins,* —— U.S. ——, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

The Third Circuit has recently stated that this basic framework illustrates that to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its actions, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate, non-discriminatory reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative or motivating cause of the employer's action. *Id.* at 764 (citations omitted). Therefore, if the plaintiff has pointed to some evidence discrediting the defendant's proffered reasons, "to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.*

When deciding what quantum of evidence is required for a nonmoving plaintiff to avoid summary judgment, the Third Circuit rejected the following two extreme positions: that the plaintiff can avoid summary judgment simply by arguing that the jury need not believe the defendant's proffered legitimate explanations on the one hand, or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations on the other. *Id.* The Third Circuit concluded that to avoid summary judgment, the plaintiff's evidence rebutting the employer's tendered reasons "must allow a factfinder to reasonably infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citations omitted) (emphasis in original).

 Furthermore, since the factual dispute at issue is whether discriminatory animus motivated the employer and not whether the employer is "wise, shrewd, prudent, or

*gated on other grounds, Seman v. Coplay Cement* *Co.,* 26 F.3d 428 (3d Cir.1994).

competent," to discredit the employer's proffered reason the plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Id.* at 765. Rather, the plaintiff must demonstrate

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (citations omitted) (emphasis in original).

Plaintiff asserts claims against CNBC for failure to hire him under Title VII, the ADEA, and the LAD and claims against NBC under the LAD. I will first address the claim against CNBC.

■ The first question is whether or not plaintiff has made out a prima facie case of discrimination against CNBC. This court is mindful of the Supreme Court's admonition that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). There is no dispute that as an Hispanic over 40 years old, plaintiff is in a protected class for purposes of Title VII, the ADEA, and the LAD. In addition, there is evidence in the record that plaintiff repeatedly applied for positions for which he was qualified, and that plaintiff was rejected. Lastly, there is evidence in the record, that during the time period in which plaintiff was applying for jobs, CNBC hired other persons for these positions. Therefore, plaintiff has made out a prima facie case of discriminatory hiring.

■ Thus, the burden of production shifts to CNBC to articulate a legitimate non-discriminatory reason for its failure to hire plaintiff. CNBC asserts that plaintiff was not hired because Nelson Rosabal, who is the Vice President of Personnel for CNBC and is Hispanic, was informed by Paul Besson, the Director for Employee Relations for NBC in Washington that he did not recommend plaintiff for future employment. Besson told Rosabal that plaintiff's supervisors in Washington did not think his work was good enough to merit rehire. Besson formed this opinion from conversations he had with Ron Knox, who was plaintiff's supervisor in Washington. Knox based his opinion of plaintiff's work on statements by Cindy Bickford, who was at one time plaintiff's supervisor, that he was not an able documentary editor because he was very slow at operating the equipment. In addition, after Ms. Bickford left NBC, Knox became plaintiff's supervisor and observed plaintiff make several on-air mistakes (i.e., the two blackouts) and have problems with technical equipment. Taken as true, CNBC has thus articulated a legitimate non-discriminatory reason for its failure to hire plaintiff.

■ Therefore, to avoid summary judgment, plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve CNBC's articulated legitimate, non-discriminatory reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative or motivating cause of CNBC's action.

■ Plaintiff has submitted affidavits by Raphael Farkas, who was a segment producer for the NBC news magazine "1986" at the time that plaintiff worked on the show, and Edward Foughy, who was the executive producer of "1986." Farkas states that the work plaintiff did for him was "excellent." In addition, Farkas states that, based on his 32 years in broadcast journalism, blackouts on live news shows are "not uncommon." Foughy states that plaintiff's work on the show "1986" was "always done timely and well." Foughy also states that in his experience blackouts are "not uncommon." Lastly, Foughy states that the playback operator (the position held by plaintiff at the time of the blackouts) should not necessarily be blamed for the blackouts. Blackouts can result from the director's failure to give the proper cue. Plaintiff, in his affidavit, asserts that the blackouts were the result of studio director, William Krebs' failure to give him the proper cue.

Keeping in mind that on summary judgment all inferences must be drawn in favor of the nonmoving party and that to avoid summary judgment the plaintiff need not adduce evidence directly contradicting defendant's proffered explanation, I conclude that based on this evidence, a factfinder could reasonably disbelieve CNBC's articulated legitimate, non-discriminatory reasons for refusing to hire plaintiff. Therefore, plaintiff has raised a genuine issue of material fact precluding the entry of summary judgment on plaintiff's failure to hire claim against CNBC.

■ Plaintiff also asserts a failure to hire claim against NBC due to NBC's failure to hire plaintiff after he was laid off. Plaintiff has made out a prime facie case of discrimination against NBC. *See* Martinez Cert. at 9–10. In their papers, defendants do not specifically address plaintiff's failure to hire claim against NBC. Presumably NBC's reason for not hiring plaintiff would be the same as CNBC's (i.e., the poor recommendation from NBC in Washington). As discussed above, plaintiff has raised a genuine issue of material fact regarding this issue which prevents the granting of summary judgment.

In conclusion, defendants' motion for summary judgment on plaintiff's failure to hire claims is denied.

### C. Hostile Work Environment.

Plaintiff claims that NBC, WNBC–TV, and WRC–TV created a hostile work environment in violation of the LAD. Defendants first argue that plaintiff's claims are barred by the statute of limitations.

■ The Supreme Court of New Jersey recently held that the applicable statute of limitations for LAD claims is two years. *See Montells v. Haynes*, 133 N.J. 282, 627 A.2d 654 (1993). However, the court also stated that the two year statute of limitations period applies only prospectively (i.e., only to cases

in which the operative facts arose after the date of its decision). *Id.* at 298, 627 A.2d 654. The defendants concede this, and argue that even under the old six year statute of limitations, most of plaintiff's claims are barred. *See Lautenslager v. Supermarkets Gen.*, 252 N.J.Super. 660, 664, 600 A.2d 525 (Law Div.1991) (applying six year statute of limitations to LAD claim).

Therefore, the question is which of plaintiff's claims accrued six years prior to his filing of his complaint on March 20, 1992. In other words, which claims accrued prior to March 20, 1986.

On July 5, 1986, plaintiff obtained permanent employment from NBC and WRC–TV, NBC's affiliate, in Washington. Plaintiff's hostile work environment claims against these defendants for actions during the time period from July 5, 1986 until plaintiff's termination on October 30, 1987 are clearly not barred by the statute of limitations.

■ However, plaintiff's claim for hostile work environment against WNBC–TV in New York is barred by the statute of limitations. Plaintiff worked for WNBC–TV as a videotape editor from May 20, 1985 to September 27, 1985. Plaintiff's hostile work environment claim against WNBC–TV appears to be based on allegations that during this time period, Chuck Scarborough, a WNBC–TV news anchor, refused to work with plaintiff after learning of his national origin. This cause of action clearly accrued prior to June 22, 1986, and therefore, plaintiff's claim against WNBC–TV is barred.[5]

Now I will address the substance of plaintiff's claim of hostile work environment against WRC–TV and NBC in Washington.

■ In *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993), the New Jersey Supreme Court delineated the elements of a cause of action for hostile work environment sexual harassment. Whether

---

5. In addition, there is no evidence in the record to suggest that plaintiff's allegations against WNBC–TV taken together with his allegations against WRC–TV and NBC in Washington could be considered a continuing violation for the purpose of tolling the statute of limitations, and in fact plaintiff never makes this argument. *See Bermingham v. Sony Corp. of America, Inc.*, 820

F.Supp. 834, 850 (D.N.J.1992) (" 'To prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts of intentional discrimination.' ") (quoting *Jewett v. International Telephone and Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.1981)).

the hostile work environment is due to discrimination based on race or sex, the law is the same. *See Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 859–60 (3d Cir.1990) ("Oppressive and hostile work environments, whether they be infected with racial or sexual hostility, give rise to harassment claims on the theory that a discriminatory environment is a term or condition of employment."); *Dickerson v. State of N.J. Dept. of Human Services,* 767 F.Supp. 605, 614 (D.N.J.1991) (stating that law is same for racially hostile work environment and sexually hostile work environment) (citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). Therefore, the New Jersey Supreme Court's *Lehmann* decision, in which the court discussed the elements of a cause of action for hostile work environment due to sexual harassment, is applicable to this case.

█ Thus, to state a claim for hostile work environment due to racial harassment under the LAD, the plaintiff must show that the complained-of conduct (1) would not have occurred but for his race; and it was (2) severe or pervasive enough to make a (3) reasonable person of plaintiff's race believe that (4) the conditions of employment were altered and the working environment was hostile or abusive. *See Lehmann,* 132 N.J. at 603–04, 626 A.2d 445.

█ In this case, plaintiff alleges the following conduct in support of his claim that there was a racially hostile work environment at WRC–TV and NBC in Washington: After the cancellation of the news magazine program "1986," plaintiff was reassigned to defendant's NBC News EJ–Washington operations. Plaintiff asserts, among other things, that some NBC "employees ostracized [him] because of [his] race." Martinez Cert. at ¶ 22. Plaintiff also asserts that the defendants failed to provide him with a proper editing room, the necessary equipment to do his job, and the proper training. The only specific allegations plaintiff makes regarding racial harassment deal with plaintiff's relationship with William Krebs, a NBC News studio director. Plaintiff states in his certification that Krebs uttered derogatory racial and ethnic remarks about plaintiff to plain-

tiff's supervisor and co-workers. Martinez Cert. at ¶ 23. Plaintiff also states in his certification that he never personally heard Krebs make these racial remarks; plaintiff states that his supervisor, Carrol Dwinnell told him about the remarks. Martinez Cert. at ¶ 23. At plaintiff's deposition he first stated that Dwinnell told him that Krebs made derogatory ethnic remarks about plaintiff after the two blackouts occurred. Martinez Dep. at 110. However, upon further questioning plaintiff stated that Dwinnell never specifically stated that Krebs made racial or ethnic remarks; plaintiff stated that he assumed that the remarks were racial or ethnic. Martinez Dep. at 111–12.

Even if the court assumed that Krebs actually made derogatory racial remarks about the plaintiff, plaintiff has failed to put forth sufficient evidence to demonstrate that Krebs' conduct was severe or pervasive enough to make a reasonable person of plaintiff's race believe that the conditions of employment were altered and the working environment was hostile or abusive. *See Lehmann,* 132 N.J. at 606, 626 A.2d 445 (". . . it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable [person of plaintiff's race], make the working environment hostile,. . . ."). *See also Drinkwater,* 904 F.2d at 863 ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere."); *Dickerson,* 767 F.Supp. at 613 ("[I]n order to establish a hostile atmosphere, a plaintiff must prove more than a few isolated incidents of racial enmity."). In addition, plaintiff clearly cannot maintain a hostile work environment action based on his mere assumption that the derogatory remarks made about him by Krebs were racial in character. Therefore, plaintiff has failed to raise a genuine issue of material fact concerning whether there was a hostile work environment, and defendants' motion for summary judgment on plaintiff's hostile work environment claims are granted.

### D. Defamation.

Lastly, plaintiff asserts a claim for defamation arising from Knox's statements to Bes-

son and Besson's subsequent statements to Rosabal that the plaintiff did not merit re-hire.

Defendants do not dispute that these statements are defamatory.[6] Defendants argue that plaintiff's action for defamation is barred by the statute of limitations, and in the alternative, that the statements are privileged.

■ First, I will address defendants' statute of limitations argument. The text of the relevant New Jersey statute provides that "[e]very action at law for libel or slander shall be commenced within 1 year next after the publication of the alleged libel or slander." N.J.S.A. 2A:14–3. In this case, the publication took place no later than February of 1991 when Rosabal informed plaintiff that CNBC would not hire him. Rosabal Aff. at ¶ 10. Plaintiff filed his complaint on March 20, 1992—more than one year after the latest possible date of publication. Therefore, plaintiff's claim is barred by the statute of limitations.

Plaintiff argues that this court should apply a discovery rule to the New Jersey statute of limitations for defamation actions. If a discovery rule were applied, plaintiff argues, the statute of limitations would have been tolled until April 30, 1991, the date on which plaintiff learned of the defamatory statements in defendants' response to plaintiff's EEOC charge. Thus, plaintiff's defamation action would not be time-barred.

Plaintiff bases his argument on a recent opinion by the New Jersey Supreme Court in which the court stated, that if squarely presented with the issue, it may revisit an earlier decision in which it held that a discovery-rule exception is unavailable in defamation cases. See Williams v. Bell Telephone Laboratories Inc., 132 N.J. 109, 120, 623 A.2d 234 (1993) (referring to its decision in Lawrence v. Bauer Publishing & Printing Ltd., 78 N.J. 371, 396 A.2d 569 (1979)). Plaintiff argues that because the issue is squarely presented here, this court should predict whether or not the New Jersey Supreme Court would

reverse itself if presented with the issue. However, the Third Circuit has stated that [i]n as much as *no New Jersey cases are squarely on point*, it is important to make clear that [the] disposition of this case must be governed by a prediction of what a New Jersey court would do if confronted with the facts before us. *Bulloch v. United States*, 487 F.Supp. 1078, 1082 (D.N.J.1980) (quoting *Becker v. Interstate Properties*, 569 F.2d 1203, 1204–06 (3d Cir.1977), *abrogated on other grounds, Robinson v. Jiffy Executive Limousine*, 4 F.3d 237 (3d Cir.1993)) (emphasis added).

■ The problem with plaintiff's argument is that there are New Jersey cases on point which interpret the defamation statute of limitations, N.J.S.A. 2A:14–3, to not include a discovery-rule exception. *See Lawrence v. Bauer Publishing and Printing Ltd.*, 78 N.J. 371, 396 A.2d 569 (1979), *rev'g on dissent below* 154 N.J.Super. 271, 276, 381 A.2d 358 (App.Div.1977) (discovery rule inapplicable to one-year statute of limitations for defamation contained in N.J.S.A. 2A:14–3). *See also Palestri v. Monogram Models, Inc.*, 875 F.2d 66, 70 (3d Cir.1989) ("New Jersey eschews to discovery rule in libel cases and holds that the statute of limitations for libel, unlike that for personal injuries, is measured from the time of publication rather than the time a cause of action accrues.") (citing *Lawrence*, 78 N.J. at 375, 396 A.2d 569 (Pashman, J., concurring)). Given that the New Jersey Supreme Court is the ultimate interpreter of New Jersey's statutes and that a federal court is bound by its construction, *see Euster v. Eagle Downs Racing Ass'n*, 677 F.2d 992, 994 n. 4 (3d Cir.1982), I believe it would be improper to not follow New Jersey law as it now exists and to engage in predicting whether or not the New Jersey Supreme Court might change that law.

Thus, a discovery-rule exception does not apply to the statute of limitations for defamation actions and defendants' motion for summary judgment on plaintiff's defamation claim is granted. Because I am granting defendants' motion based on the statute of

---

**6.** *See Printing Mart v. Sharp Electronics*, 116 N.J. 739, 766, 563 A.2d 31 (1989) (stating that false statements that adversely affect a plaintiff's repu-

tation, business, trade, or profession are actionable).

limitations I will not address whether the statements are protected by a privilege.

## CONCLUSION

For the reasons detailed above, 1) defendants' motion for summary judgment based on the general release is **DENIED;** 2) NBC's and CNBC's motion for summary judgment on plaintiff's failure to hire claims is **DENIED;** 3) NBC's, WNBC–TV's, and WRC–TV's motion for summary judgment on plaintiff's hostile work environment claims is **GRANTED;** and defendants' motion for summary judgment on plaintiff's defamation claim is **GRANTED.**